[Cite as *State v. Durgan*, 2018-Ohio-2310.]

# IN THE COURT OF APPEALS
## FIRST APPELLATE DISTRICT OF OHIO
## HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-170148 |
| | | TRIAL NO. B-1602627 |
| Plaintiff-Appellee, | : | |
| | | *O P I N I O N.* |
| vs. | : | |
| | | |
| DONALD DAWSON DURGAN, | : | |
| | | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: June 15, 2018

*Philip R. Cummings*, Assistant Hamilton County Prosecuting Attorney, for Plaintiff-Appellee,

*Timothy J. McKenna*, for Defendant-Appellant.

**DETERS, Judge.**

{¶1}   Following a jury trial, defendant-appellant Donald Dawson Durgan was convicted of aggravated murder under R.C. 2903.01(B), aggravated robbery under R.C. 2911.01(A)(1), both with accompanying firearm specifications, and having weapons while under a disability under R.C. 2923.13(A)(2).  He has filed a timely appeal.  We find no merit in his five assignments of error, and we affirm his convictions.

### I.   Factual Background

{¶2}   The record shows that on May 4, 2016, Anant Singh's wife returned home from working the night shift as a nurse to find her husband dead on the floor of the garage.  He had been shot in the torso.  Immediately after she found him, Durgan pulled into their driveway in a white pickup truck.

{¶3}   Singh was a successful mechanical engineer.  He and his daughter also operated a business leasing rental property.  Singh had hired Durgan to help maintain and manage the properties.  Singh was a kind-hearted man.  Several witnesses testified that Singh considered Durgan to be like a son to him, and Durgan would often eat dinner at Singh's residence with his family.  As a result of this close relationship, Durgan knew the daily schedules of both Singh and his wife.  Singh trusted Durgan and had lent him money in the past.

{¶4}   When police arrived at the scene of the murder, Durgan appeared eager to help.  He told them that he had become concerned when Singh had not appeared for a planned business meeting early that morning.  He also told them that Singh had been receiving threatening messages recently, and that they should check Singh's cell phone.  Because Durgan's truck was part of the crime scene, the police took Durgan to the police station to be interviewed.  He discussed various tenants he

believed had reason to threaten Singh and allowed the police to download information from his phone.

{¶5} Singh's neighbors testified that the evening before the murder, they had seen a lone African-American man that they did not know walking around the neighborhood wearing a hooded sweatshirt. One witness, who lived in the apartment complex directly behind the Singhs' street, got up to walk at 4:15 a.m. on the morning of the murder. He heard what sounded like a gunshot, and, a few minutes later, he saw an African-American man walking toward him with a backpack. A few weeks later, the witness heard about Singh's murder and saw a photograph of Durgan. He called police and told him that he had seen that person during his walk.

{¶6} Police investigated the threatening texts on Singh's phone. They discovered that the texts came from a "burner phone" purchased by Briana Hightower, an acquaintance of Durgan, at a Family Dollar Store. Surveillance video showed Hightower purchasing the phone while Durgan's white pickup truck was parked outside the store.

{¶7} Hightower, a resident of Lexington, Kentucky, would come to Cincinnati to gamble at Jack Casino, formerly known as Horseshoe Casino. She would sometimes meet Durgan there. She told police that on May 2, 2016, two days before the murder, she met Durgan at the casino. He asked her to buy a phone for him for $20 at the Family Dollar Store. She went in and purchased it while he waited outside the store. After she gave it to him, she saw him text someone.

{¶8} Durgan had lost substantial amounts of money gambling, and he also owed large sums of money to drug dealers. Singh's daughter, who ran the business with Singh, discovered numerous financial irregularities involving Durgan. She testified that Durgan had been taking rent money from tenants, even though she had

told him not to do so, and had not been turning the money over to her or Singh. She further stated that she knew Durgan as "Don Dawson," that she had never heard the name "Durgan," and that the family was unaware of Durgan's criminal record.

{¶9} Singh was supposed to leave town on the day of the murder. He had planned to meet with Durgan at 6:00 a.m. that morning at a nearby day-care center. But video surveillance cameras did not show Durgan at the day-care center until later that morning, even though he claimed that he had become concerned because Singh had not appeared as planned.

{¶10} On May 10, 2016, the police conducted a follow-up interview with Durgan to obtain any additional information Durgan could give them. They mostly asked Durgan about tenants who may have had a grudge against Singh. Nevertheless, the police did have concerns about Durgan at that time. They had obtained a search warrant to install a GPS device on his car. They installed the GPS during the interview without Durgan's knowledge.

{¶11} On May 13, 2016, the police again interviewed Durgan. By that time, he was considered a suspect. He was read his rights, and the police conducted a lengthy interrogation. During that interrogation, Durgan's story changed a number of times. He eventually acknowledged that Singh had previously loaned him a substantial amount of money, but that Singh had refused to give him any more. He admitted to sending the threatening text messages to Singh, but he claimed that he just wanted to get Singh out of town for Singh's own protection. He also admitted to setting up a robbery, but he claimed that an unknown drug dealer had arrived at the scene and had killed Singh.

## II. Statements to the Police

{¶12}   In his first assignment of error, Durgan argues that the trial court erred in overruling his motion to suppress his statements to the police.  He argues that the first two times he talked to the police, he was not informed of his rights in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). He further argues that the third time he talked to police his statements were not made voluntarily.  This assignment of error is not well taken.

### A. No Custodial Interrogation

{¶13}   Police officers must advise a person of his or her *Miranda* rights when that person is subject to custodial interrogation.  *State v. Tucker*, 81 Ohio St.3d 431, 435-436, 692 N.E.2d 171 (1998); *State v. Bell*, 2015-Ohio-1711, 34 N.E.3d 405, ¶ 31 (1st Dist.).  Whether a suspect is in custody is an objective inquiry.  *J.D.B. v. North Carolina*, 564 U.S. 261, 270, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011); *Bell* at ¶ 31.

{¶14}   This determination requires two "discrete inquiries": (1) what were the circumstances surrounding the interrogation, and (2) given those circumstances, would a reasonable person have felt that he was at liberty to terminate the interrogation and leave.  *J.D.B.* at 270; *Bell* at ¶ 32.  "Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."  *J.D.B.* at 270*,* quoting *Thompson v. Keohane,* 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995).

{¶15}   The first time police interviewed Durgan was on May 4, 2016, the day of the murder.  Durgan was already at the scene when the police arrived.  He appeared eager to help and volunteered that the victim had been receiving threatening text messages.  Durgan agreed to accompany police back to the police

station to be interviewed. Because his truck was part of the crime scene, he could not drive it so police offered to drive him. He was considered a witness, and he was not handcuffed. He points out that a neighbor drove the victim's wife to the police station and that she was not in a police cruiser. But no neighbor offered to drive Durgan, so a police detective drove him. Though he was sitting in a marked cruiser writing a witness statement when detectives first arrived, he was transported in an unmarked car. The only restraint involved was a seat belt. Because Durgan was hungry and diabetic, the detective took him to a restaurant drive-through.

{¶16} At police headquarters, Durgan voluntarily provided more details about his attempts to meet with Singh that morning and his concern when Singh did not appear as planned. Durgan gave police his phone number so police could check his phone records. At the end of the interview, Durgan was allowed to leave and the police gave him a ride back to the crime scene to get his truck. Thus, the record shows that there was no restraint to the degree of a formal arrest, and a reasonable person in Durgan's position would have felt free to leave. Therefore, he was not in custody, and no *Miranda* warnings were required.

{¶17} The police interviewed Durgan again on May 10, 2016. After reviewing Singh's and Durgan's phone records, the police decided that they needed to conduct a follow-up interview with Durgan. They called him and asked him to come to police headquarters, which he did voluntarily. He drove himself there, and he was not handcuffed or searched. Police were seeking to obtain any additional information that he may have left out or forgotten at the previous interview. The interview was not lengthy, and afterward, Durgan was allowed to leave.

{¶18} Police did have some concerns about Durgan. They obtained a search warrant to install a GPS device on his car so that they could locate him if needed. One of the reasons for the follow-up interview was to accomplish that task.

Nevertheless, Durgan did not know about the GPS, so it could not have affected his behavior.

{¶19}   Once again, the record shows that there was no restraint to the degree of a formal arrest, and a reasonable person in Durgan's position would have felt free to leave.  Police need not give *Miranda* warnings to every person they question, even if the police suspect that person of being involved in a crime.  *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 47.  Consequently, the police were not required to advise Durgan of his *Miranda* rights at the May 10 interview.

### B.   Waiver of Miranda Rights/Voluntariness

{¶20}   The situation had changed by May 13, 2016.  Durgan was considered a suspect and was under arrest when he arrived at police headquarters.  The police advised him of his *Miranda* rights and questioned him extensively.  Durgan argues that his statements to the police were involuntary and that his will was overborne.

{¶21}   This argument involves two distinct issues: (1) whether Durgan knowingly, intelligently and voluntarily waived his *Miranda* rights; and (2) whether he made his statement to the police voluntarily under the Due Process Clause of the United States Constitution.   We analyze both issues using a totality-of-the circumstances test.  *State v. Eley*, 77 Ohio St.3d 174, 178, 672 N.E.2d 640 (1996); *State v. Burton*, 1st Dist. Hamilton No. C-080173, 2009-Ohio-871, ¶ 9.

{¶22}   Under the *Miranda* analysis, the state bears the burden to prove by a preponderance of the evidence that the accused made a knowing, voluntary, and intelligent waiver of his *Miranda* rights.   Courts will not presume a waiver just because the accused responded to the interrogation.   *State v. Edwards*, 49 Ohio St.2d 31, 38, 358 N.E.2d 1051 (1976); *Burton* at ¶ 10.

**{¶23}** A suspect's decision to waive his Fifth Amendment privilege is made voluntarily absent evidence that his will was overborne or that his capacity for self-determination was critically impaired because of coercive police misconduct. *State v. Dailey*, 53 Ohio St.3d 88, 559 N.E.2d 459 (1990), paragraph two of the syllabus; *Burton* at ¶ 11. "Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." *Dailey* at 91, quoting *Moran v. Burbine*, 475 U.S. 412, 422-423, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

**{¶24}** Under the due-process analysis, the prosecution must prove by a preponderance of the evidence that a confession was voluntary. *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *Burton*, 1st Dist. Hamilton No. C-080713, 2009-Ohio-871, at ¶ 12.

> In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of the interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.

*Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051, at paragraph two of the syllabus. Coercive police activity is necessary to a finding that a confession was involuntary within the meaning of the Due Process Clause. *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *State v. Combs*, 62 Ohio St.3d 278, 285, 581 N.E.2d 1071 (1991); *Burton* at ¶ 12.

{¶25} Durgan contends that he initially denied any involvement in the crime, but finally confessed after six hours of intensive interrogation. The record does reflect that the interrogation was lengthy, but it also shows that he was fed twice and given breaks to use the restroom. He was read his rights, and indicated that he understood them. He never stated that he did not wish to talk to the police, that he wanted to leave, or that he wanted to talk to a lawyer. He continued to talk about the murder for quite some time.

{¶26} Durgan cites to testimony at the trial, claiming that his statements were involuntary due to the police's use of an allegedly coercive police technique called the "Reid Method." While there was testimony about that technique at trial, the issue was not raised at the hearing on the motion to suppress. This court may only consider evidence presented at the suppression hearing. *State v. Tapke*, 1st Dist. Hamilton No. C-060494, 2007-Ohio-5124, ¶ 47.

{¶27} Durgan continued to deny having any knowledge about the murder, although his story changed a number of times. He eventually stated that he owed drug dealers a lot of money and had substantial gambling debts. He stated that he had set up a robbery of the victim, and that an unnamed drug dealer had appeared and shot the victim. He never confessed to shooting the victim himself, thus undercutting his claim that his will was overborne.

{¶28} In sum, the totality of the circumstances shows that Durgan's statements to the police were voluntary and that he voluntarily waived his *Miranda* rights. Therefore, the trial court did not err in overruling his motion to suppress his statements to the police, and we overrule Durgan's first assignment of error.

### III. Batson Challenges

{¶29}   In his second assignment of error, Durgan contends that the trial court erred by not finding purposeful discrimination by the state against African-American jurors during voir dire.  He argues that the state's reasons for excusing two African-American jurors were pretextual.  This assignment of error is not well taken.

{¶30}   In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court held that the Equal Protection Clause of the United States Constitution precludes purposeful discrimination by the state in the exercise of preemptory challenges so as to exclude members of minority groups from petit juries.  *State v. O'Neal*, 87 Ohio St.3d 402, 409, 721 N.E.2d 73 (2000); *State* v. *Wright*, 2017-Ohio-1568, 90 N.E.3d 162, ¶ 19 (1st Dist.).  *Batson* established a three-step procedure for evaluating claims of racial discrimination in the use of peremptory challenges.  *State v. White*, 85 Ohio St.3d 433, 435, 709 N.E.2d 140 (1999); *Wright* at ¶ 19.

{¶31}   First, the opponent of a peremptory strike must make a prima facie showing of discrimination. Second, the proponent of the strike must give a race-neutral explanation for the strike.  *State v. Herring*, 94 Ohio St.3d 246, 255-256, 762 N.E.2d 940 (2002); *Wright* at ¶ 20.  The state's reason is deemed to be race-neutral unless discriminatory intent is inherent in the explanation.  *Wright* at ¶ 20; *State v. Thomas*, 1st Dist. Hamilton No. C-120561, 2013-Ohio-5386, ¶ 15.  Third, the trial court must determine whether, under all the circumstances, the opponent has proven purposeful discrimination.  *Herring*, 94 Ohio St.3d at 256, 762 N.E.2d 940; *Wright* at ¶ 20.

{¶32}   In step three, the trial court may not simply accept a proffered race-neutral reason at face value.  Instead, it must examine the context to ensure that the reason is not merely pretextual.  If the trial court determines that the proffered

reason is merely pretextual and that a race motive is in fact behind the challenge, the juror may not be excluded. *State v. Frazier,* 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 65.

{¶33} The burden of persuasion always stays with the opponent of the strike. A reviewing court will defer to the trial court's finding that no discriminatory intent existed since it turns largely on an evaluation of credibility. *Herring* at 256; *Wright*, 2017-Ohio-1568, 90 N.E.3d 162, at ¶ 21. The reviewing court may only reverse a trial court's finding if that finding is "clearly erroneous." *Hernandez v. New York*, 500 U.S. 352, 366, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); *Wright* at ¶ 21.

{¶34} The prosecutor used peremptory challenges to excuse two African-American jurors. First, he excused juror 10. He explained that juror 10 had a pending theft charge in Hamilton County and did not believe that he was treated fairly by the justice system. The prosecutor stated, "I don't feel comfortable with him deciding the case." The record supports the prosecutor's explanation. When questioned by the prosecutor, the juror had clearly expressed dissatisfaction with the justice system.

{¶35} The prosecutor next excused juror number 12. He stated that upon initial questioning, the juror had stated that "he couldn't sign a guilty verdict, that his religion—that he was a follower of Jesus and his religion would not permit him to do that." The juror told the prosecutor that he could not judge a murder case, and that when he learned it was a murder case, his "heart just dropped." He further stated, "To be honest, I really don't want to be here." Additionally, the prosecutor stated that he also had concerns that juror 12 worked at the same company as defense counsel's wife "and basically is an underling to her."

{¶36} Thus, the prosecutor provided race-neutral reasons for the use of the peremptory challenges. Courts have upheld challenges for similar reasons. *See State*

11

*v. Murphy*, 91 Ohio St.3d 516, 528-529, 747 N.E.2d 765 (2001); *State v. Hudson*, 8th Dist. Cuyahoga No. 96986, 2012-Ohio-1345, ¶ 12-13; *State v. Jennings*, 10th Dist. Franklin Nos. 09AP-70 and 09AP-75, 2009-Ohio-6840, ¶ 25. Further, the explanation need not rise to the level of justifying the exercise of a challenge for cause. *Murphy* at 529; *Wright*, 2017-Ohio-1568, 90 N.E.3d 162, at ¶ 23. It need not even make sense as long as it does not deny equal protection. *Purkett v. Elem*, 514 U.S. 765, 769, 115 S.Ct. 1729, 131 L.Ed.2d 834 (1995); *State v. Stephens*, 126 Ohio App.3d 540, 548, 710 N.E.2d 1160 (1st Dist.1998). The record shows that the trial court's acceptance of the prosecutor's race-neutral reasons was not clearly erroneous.

{¶37} Durgan argues that the record is devoid of analysis by the trial court, but the trial court need not make detailed factual findings to comply with *Batson*. *Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, at ¶ 98; *Hudson* at ¶ 14. Consequently, we overrule Durgan's second assignment of error.

### IV. Weight and Sufficiency

{¶38} In his third assignment of error, Durgan contends that the evidence was insufficient to support his convictions. Our review of the record shows that a rational trier of fact, after viewing the evidence in a light most favorable to the prosecution, could have found that the state proved beyond a reasonable doubt all of the elements of aggravated murder, aggravated robbery, and having weapons while under a disability, along with the accompanying firearm specifications. Therefore, the evidence was sufficient to support the convictions. *See State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus; *State v. Hackney*, 1st Dist. Hamilton No. C-150375, 2016-Ohio-4609, ¶ 29.

{¶39} Durgan argues that no physical evidence linked him to the offenses. But no rule of law exists that a witness's testimony must be corroborated by physical

evidence. *Thomas*, 1st Dist. Hamilton No. C-120561, 2013-Ohio-5386, at ¶ 45. He also argues that the state presented no evidence proving that he was the perpetrator. We disagree. The state's evidence was circumstantial, but circumstantial evidence and direct evidence have the same probative value. *Jenks* at paragraph one of the syllabus; *State v. Williams*, 1st Dist. Hamilton No. C-081148, 2010-Ohio-1879, ¶ 14. Consequently, we overrule Durgan's third assignment of error.

{¶40} In his fourth assignment of error, Durgan contends that his convictions were against the manifest weight of the evidence. After reviewing the record, we cannot say the trier of fact lost its way and created such a manifest miscarriage of justice that we must reverse the convictions and order a new trial. Therefore, the convictions are not against the manifest weight of the evidence. *See State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *State v. Cedeno*, 192 Ohio App.3d 738, 2011-Ohio-674, 950 N.E.2d 582, ¶ 25 (1st Dist.). We overrule Durgan's fourth assignment of error.

### V. Ineffective Assistance of Counsel

{¶41} In his fifth assignment of error, Durgan contends that he was denied the effective assistance of counsel. He argues that his counsel was ineffective for failing to present expert testimony on police interrogation techniques and false confessions. This assignment of error is not well taken.

{¶42} A court will presume that a properly licensed attorney is competent, and the defendant bears the burden to show ineffective assistance of counsel. *State v. Hamblin*, 37 Ohio St.3d 153, 155-156, 524 N.E.2d 476 (1988); *Hackney*, 1st Dist. Hamilton No. C-150375, 2016-Ohio-4609, at ¶ 36. To sustain a claim for ineffective assistance of counsel, the defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland*

13

*v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Hackney* at ¶ 36.

{¶43}   Generally, the decision not to call an expert witness does not constitute ineffective assistance of counsel because that decision is solely a matter of trial strategy.   *State v. Coleman*, 45 Ohio St.3d 298, 307-308, 544 N.E.2d 622 (1989); *State v. Tobert*, 1st Dist. Hamilton No. C-010700, 2003-Ohio-675, ¶ 19. Further, Durgan's counsel extensively and thoroughly cross-examined the lead detective about the Reid Method and other interrogation techniques.  The detective acknowledged that the Reid Method can lead to false confessions.

{¶44}   The record shows that Durgan's counsel provided a diligent and thorough defense.  Durgan has not demonstrated that counsel's representation fell below an objective standard of reasonableness or that, but for counsel's unprofessional errors, the results of the procedure would have been otherwise. Therefore, he has failed to meet his burden to show ineffective assistance of counsel. *See Strickland* at 687-689; *Hackney* at ¶ 37-38.   We overrule Durgan's fifth assignment of error.

### *VI. Summary*

{¶45}   In sum, we find no merit in Durgan's five assignments of error.  We, therefore, affirm the judgment of the trial court.

Judgment affirmed.

**CUNNINGHAM, P.J.,** and **ZAYAS, J.,** concur.

Please note:

The court has recorded its own entry this date.