[Cite as *State v. Jackson*, 2022-Ohio-2562.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-210466 |
| | | TRIAL NO. B-2000335 |
| Plaintiff-Appellee, | : | |
| | | *O P I N I O N.* |
| vs. | : | |
| LARRY JACKSON, JR., | : | |
| Defendant-Appellant. | : | |


Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal: July 27, 2022


*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Paula E. Adams*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Arenstein & Gallagher* and *Elizabeth Conklin*, for Defendant-Appellant.

**MYERS, Presiding Judge.**

{¶1} Defendant-appellant Larry Jackson, Jr., appeals from the trial court's entry convicting him, following a bench trial, of four counts of rape. In this appeal, Jackson challenges the trial court's denial of his motion to suppress, the performance of his trial counsel, the trial court's granting of the state's motion to amend the indictment, and the sufficiency and the weight of the evidence supporting his convictions.

{¶2} Finding the assignments of error raised by Jackson to be without merit, we affirm the trial court's judgment.

### *Factual and Procedural Background*

{¶3} In August 2019, K.B., who was 12 years old at the time, disclosed to a family member that Jackson, who was her cousin, had committed various sexual offenses against her several years earlier. The offenses occurred while K.B. and Jackson were both at the home of her great-grandmother (who was also Jackson's grandmother) Linda Coleman.

{¶4} After learning of K.B.'s allegations, Jackson voluntarily went to the police station to speak with Cincinnati Police Detective Aaron Roach. Detective Roach read Jackson his *Miranda* rights prior to interviewing him. Jackson told Detective Roach that he stayed at Coleman's home for a short period of time several years earlier, but that he was very seldom at the house during that time, and that Coleman let him sleep in her bedroom while he stayed there. Jackson was not clear on the exact time frame in which he lived with Coleman, but believed it was in 2015 or 2016. When asked about K.B.'s allegations, Jackson adamantly denied them.

{¶5} At the conclusion of the interview, Jackson agreed to take a polygraph examination. Both the examination and pre- and post-examination interviews were

conducted by Officer Edwin Rivera. During the post-examination interview, Jackson initially denied all allegations, as he had during the pre-examination interview and the polygraph examination itself. But he later stated that "I touched her but I never had sex with her," and he admitted to touching K.B.'s bottom. After Officer Rivera continued to push back and to challenge Jackson's statements, he admitted to having oral sex with K.B.

{¶6} In January 2020, Jackson was indicted on four counts of rape in violation of R.C. 2907.02(A)(1)(b), specifically two counts of vaginal intercourse, one count of fellatio, and one count of digital penetration. The indictment alleged that the offenses occurred between April 1, 2015, and October 1, 2015, and that victim K.B. was less than ten years of age when the offenses were committed.

{¶7} Prior to trial, Jackson filed a "motion in limine/motion to suppress." He sought an order prohibiting any reference to the fact that he had taken a polygraph examination, to the results of the polygraph examination, and to any statements made during the polygraph examination. Jackson filed a supplemental motion to suppress arguing that he was not properly Mirandized and that his confession was involuntary. Following a hearing, the trial court denied Jackson's motion to suppress. But it granted the motion in limine in part and prohibited any mention of the polygraph examination.

{¶8} At trial, K.B.'s grandmother Lena Burnett (who was Coleman's daughter) testified that she has cared for K.B. and her younger siblings for years. From April 2015 to October 2015, the time period specified in the indictment, Burnett took K.B. and her siblings to the home of K.B.'s great-grandmother Linda Coleman so that Coleman could babysit them before and after school. She testified that at some point during that period of time, Jackson lived with Coleman for a two-week period.

{¶9} Burnett testified that K.B. was in the third grade when these offenses occurred. She initially stated that K.B. began third grade in August 2015. But after

looking at K.B.'s medical records, she recalled that K.B. had repeated kindergarten because of a childhood illness and in fact had started second grade, not third, in August 2015.

{¶10} After K.B. testified that she was born on August 6, 2007, and that she started third grade in the year 2016, the state requested an in-chambers on the record conference. It informed the court that it now anticipated that K.B.'s testimony would indicate that the offenses occurred in 2016, rather than 2015, stating "[K.B.], I anticipate, is going to testify that any sexual conduct occurred in the early part of third grade, which would mean it was 2016." The state asserted, "The indictment was processed in relation to what Jackson says in his interview about the dates. So there is going to be a discrepancy between when [K.B.] says it happened and when Jackson says it happened." It made a motion to amend the indictment to include the time period of April 1, 2016, through October 1, 2016, in addition to the time period originally specified in the indictment. Defense counsel argued that the motion was premature because K.B. had yet to testify about the time frame in which the offenses occurred. The trial court elected to hold the motion in abeyance.

{¶11} K.B.'s testimony continued following the in-chambers conference. She stated that Jackson had engaged in sexual conduct with her three times when she was nine years old and going into the third grade, all incidents occurring when they were both at her great-grandmother Linda Coleman's house and she had been left home alone while Coleman and her siblings went to the store. During the first incident of sexual conduct with Jackson, K.B. testified that he called her into Coleman's bedroom, pulled down her pants, and put his finger in her vagina. During both the second and third incidents, K.B. pretended to be asleep while Jackson put his penis inside her vagina. K.B. testified that Jackson never put his penis anywhere else inside her body. K.B. did not tell anyone what Jackson had done to her until August 2019, which was approximately three years after the offenses occurred.

4

{¶12} To help her refresh her recollection of Jackson's actions, K.B. was shown a letter that she had written in August 2019 describing what Jackson had done to her. After twice reading the letter, she testified that during one of the incidents of sexual conduct, Jackson told her to open her mouth, and that after she did so, he squirted something into her mouth.

{¶13} K.B. also testified about her interview at the Cincinnati Children's Hospital Mayerson Center. She acknowledged that she repeatedly stated during the interview that she had a bad memory. She also told the interviewer that Jackson took off her clothes, with the exception of her bra and underwear, and touched her chest under her bra.

{¶14} Tracy Colliers, a social worker at Cincinnati Children's Hospital's Mayerson Center, testified that she had conducted a diagnostic interview of K.B. for purposes of medical diagnosis and treatment. The interview was recorded and played for the court.

{¶15} Officer Edwin Rivera testified about his interview of Jackson on January 15, 2020. A video of the interview was admitted into evidence and a portion of it was played for the court. Rivera's interview of Jackson, which occurred immediately after the polygraph examination was administered, lasted approximately 90 minutes. It included Jackson's initial denials of engaging in sexual conduct with K.B., and then his admission that he had touched K.B.'s bottom but had not engaged in sex with her. Upon extensive challenging of his statement by Officer Rivera, Jackson subsequently admitted to engaging in oral sex with K.B. Jackson told Officer Rivera that K.B. was alone in bed when he got home in the middle of the night, and that the other children were in the living room. He told Officer Rivera that "she put her mouth on there and put the tip on it, and then she put her hand on it. And it was like three, five seconds, and I just told her to get off." Jackson stated that "it just happened," and that he left

afterwards. He denied ejaculating in K.B.'s mouth, and he maintained that any sexual conduct with K.B. only happened one time.

{¶16} Officer Rivera described the conditions of the interview, stating that he sat less than a foot from Jackson in Jackson's personal space, that Jackson was not given food or water during the approximately three-hour interview, and that Jackson was not given, nor had he asked for, access to the bathroom.

{¶17} At the close of the state's case, the trial court revisited the state's motion to amend the indictment. Jackson objected to the amendment, arguing that if it was granted, he would no longer be able to present an alibi defense. The trial court granted the motion to amend, recognizing that Crim.R. 7(D) permits the liberal amendment of indictments. It stated that:

> This doesn't change the essential elements as the prosecutor has pointed out. That would be a different matter, if it changed the age of the victim because that is an essential element, but this is more of the notice of the time.
>
> Furthermore, it wasn't so much—I mean, I think even from the start of the criminal investigation, even the defendant knew about, at least roughly, what period of time they were looking at because it was the period of time he was living with his grandmother, the victim's great-grandmother.
>
> I don't believe that it rises to the level of prejudice because it's still talking about a period of time when she was living there, and that's the period of time that both the witnesses, as well as the State's case, is resting on, and I don't find that rises to the level of prejudice.
>
> And, furthermore, this could simply be a scrivener's error, substituting '15 for '16 when it was put together. But the victim and the other witnesses seem to be pretty clear about the age, or, at least, what grade

she was going into at the time this happened.  Frankly, she seemed

pretty definitive about that.

The indictment was amended to include the time period of April 1 to October 1 in both the calendar years 2015 and 2016.

**{¶18}**  Detective Roach was called as a witness by Jackson.  He testified that he began investigating this case in August of 2019 after K.B.'s family called to report her allegations.  Detective Roach stated that the dates on the incident report for these offenses were different than the dates originally specified in the indictment.  The incident report listed the dates of the offenses as September 2016 through May 2017, the time period when K.B. was in third grade.  Detective Roach first explained that he determined the dates used in the indictment based on information obtained from Jackson during the post-polygraph-examination interview regarding when Jackson lived at his grandmother's house.  He then clarified that the dates in the indictment "came from a bunch of different things.  It came from—I mean it wasn't just from [Jackson's statements] but that did play a part of it."  When asked what else played a part, Detective Roach responded:

I mean, there were multiple parts when we were trying to narrow down the time frame, how old she was; what grade she was in; you know, the plethora of different times that he said he was there.

You know, the years had changed that he said that he was there.  And then from talking to Grandmother about when she would allow the kids to be there throughout the year and after school, which was, you know, a large time frame, and then also from the victim's testimony, or the victim's Mayerson interview.

**{¶19}**  Detective Roach also discussed his January 2020 interview with Jackson, and he stated that Jackson was adamant that he had not committed the acts he was accused of.

{¶20} Linda Coleman testified that Jackson never lived with her or stayed with her. She explained that there was a period of time where she watched K.B. and K.B.'s siblings before and after school, but that she was unaware of a time that Jackson was at her home while K.B. was there after school. Coleman could not recall a time when she left K.B. at home while she took the other siblings to the store.

{¶21} Jackson testified that he voluntarily went to the police station in January 2020 to speak with Detective Roach to clear his name. He agreed to take the polygraph examination for the same reason. Jackson stated that he felt forced into admitting that he engaged in sexual conduct with K.B. after he was interviewed for so many hours, during which he repeatedly denied K.B.'s allegations. According to Jackson, he feared for his life, did not believe that he could leave the police station, and felt pressured to confess. He told the court that he graduated from high school, and that he had been given an individualized education plan while in high school.

{¶22} Jackson testified that there was a period of time in 2015 when he stayed over at Coleman's house after he had a falling-out with his girlfriend. During that time, he worked long hours for a moving company and rarely saw K.B. or her siblings, other than occasionally in the mornings when he was getting ready to go to work and they had been dropped off before school. According to Jackson, he never stayed the night at Coleman's when K.B. was there, and he was never alone with K.B. Jackson denied all sexual conduct with K.B.

{¶23} The trial court found Jackson guilty of all four counts of rape. It imposed a sentence of 15 years to life imprisonment on each offense and made the sentences concurrent.

***Denial of Motion to Suppress***

**{¶24}** In his first two assignments of error, Jackson challenges the trial court's denial of his motion to suppress. We consider these assignments together.

### a. Interviews, Motion to Suppress, and Court's Ruling

**{¶25}** Jackson voluntarily went to the police station on January 15, 2020, to speak with Detective Roach. Prior to speaking with Jackson, Detective Roach verified that Jackson was not under the influence of any drugs or alcohol, had graduated from high school, and that he could read and write. He then read Jackson his rights, stating:

> Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court.
>
> You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during your questioning.
>
> If you cannot afford a lawyer, one will be appointed for you before any questionings, if you wish.
>
> If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time.
>
> You also have the right to stop answering at any time until you talk to a lawyer.

Detective Roach then had Jackson explain what that recitation meant. Jackson stated, "Well, it means I have the right to talk, but if I had a lawyer present, it'd be—I don't know." Detective Roach clarified, stating that "If you want to talk to me, you can talk to me. If you want to stop talking to me—you can stop talking to me," and that "we're going to have a conversation. If you want to stop talking to me, you stop talking to

me." Jackson then signed the waiver of rights form,[1] and he began to speak with Detective Roach. He denied the allegations against him. The waiver signed by Jackson was not admitted into evidence, and our record does not contain a copy of it. Nor was the videotape of this portion of the interview admitted into evidence or played for the court. The only evidence before this court is the transcript of the interview between Detective Roach and Jackson.

{¶26} Jackson submitted to the polygraph examination with Officer Rivera immediately after his interview with Detective Roach. The videotape of this examination and subsequent interview with Officer Rivera was admitted into evidence and is part of the record on appeal. Prior to conducting the examination, Officer Rivera verified that Jackson had been read his rights and reminded him that those rights were still in effect.

{¶27} When Officer Rivera began the post-polygraph-examination interview with Jackson, he immediately confronted Jackson and told him that he failed the polygraph examination. The interview between Officer Rivera and Jackson remained confrontational for the rest of the interview. Officer Rivera did not accept Jackson's denial of misconduct, and he told Jackson on multiple occasions that he knew Jackson had done something and that Jackson needed to step up and admit it. He also encouraged Jackson to tell the truth, repeatedly stating that he could see that Jackson was a good person, and that good people make mistakes. Jackson continued to deny K.B.'s allegations, and Officer Rivera continued to inform him that he had failed the polygraph examination. Officer Rivera told Jackson several times that Jackson knew what he had done was wrong and that Jackson needed to be honest about it. Jackson

---

[1] While we do not have a copy of the form in the record, this is how Jackson characterized it in his supplemental motion to suppress. The state in its appellate brief refers to it as a notification of rights form. The parties are referring to the same form. To avoid confusion, we refer to the form in this opinion as a waiver of rights form.

eventually admitted he had touched K.B.'s bottom, although he maintained his denial of having sex with her.

**{¶28}** Officer Rivera pressed Jackson for more information, repeatedly telling Jackson that he was not being truthful and that he had failed the polygraph examination. He told Jackson three times that Jackson had committed the actions he was accused of, and he encouraged Jackson to step up and be a man. Officer Rivera reiterated that everyone makes mistakes and that he wanted to help Jackson. He told Jackson that a 13-year-old girl would not make up the allegations that were involved in this case. Officer Rivera continued to confront Jackson and refused to accept his denial of misconduct. Jackson eventually admitted to having oral sex with K.B.

**{¶29}** Jackson filed a motion to suppress, arguing that he was not properly Mirandized and that his confession was involuntary. Following a hearing, the trial court stated that it would read the two transcripts that had been submitted to it during the hearing (which were the interviews of Jackson by Detective Roach and Officer Rivera). The court subsequently issued an entry denying Jackson's motion to suppress. It found that Jackson was twice apprised of his *Miranda* rights, and that Jackson's confession was voluntary under the totality of the circumstances. It further found that Officer Rivera did not make misrepresentations, promise leniency, or engage in coercion.

### b. *Waiver of Miranda Rights/Voluntariness*

**{¶30}** Jackson argues in his first assignment of error that the trial court erred in denying the motion to suppress where it failed to determine that the waiver of his *Miranda* rights was made knowingly, voluntarily, and intelligently. And in his second assignment of error, Jackson argues that the trial court violated his right to due process by denying his motion to suppress because his confession was coerced. In

considering Jackson's arguments, we assume, without deciding, that he was in custody and that *Miranda* warnings were required.

**{¶31}** Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. We must accept the trial court's factual findings if they are supported by competent, credible evidence, but we review de novo the trial court's application of the law to those facts. *Id.*

**{¶32}** Both of Jackson's arguments—that his *Miranda* waiver was not knowing, voluntary, and intelligent, and that his confession was not voluntary—are analyzed under a totality-of-the-circumstances test. *State v. Durgan*, 1st Dist. Hamilton No. C-170148, 2018-Ohio-2310, ¶ 21; *State v. Eley*, 77 Ohio St.3d 174, 178, 672 N.E.2d 640 (1996). Under that test, we must "consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v. Wesson*, 137 Ohio St.3d 309, 2013-Ohio-4575, 999 N.E.2d 557, ¶ 35, quoting *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus.

**{¶33}** The state must prove by a preponderance of the evidence that an accused made a knowing, voluntary, and intelligent waiver of her or his *Miranda* rights. *Durgan* at ¶ 22. Absent evidence that an accused's will was overborne or his capacity for self-determination was critically impaired because of coercive police conduct, a waiver of *Miranda* rights will be considered voluntary. *Id.* at ¶ 23. "Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." *Id.*, quoting *State v. Dailey*, 53 Ohio St.3d 88, 91, 559 N.E.2d 459 (1990).

**{¶34}** The state must also prove by a preponderance of the evidence that a confession was voluntary. *Durgan* at ¶ 24. "Coercive police activity is necessary to a finding that a confession was involuntary within the meaning of the Due Process Clause." *Id.*

**{¶35}** While the trial court did not specifically find that Jackson's waiver of his *Miranda* rights was made knowingly, voluntarily, and intelligently, we find that determination implicit in the court's holding. And the record supports that finding. After verifying that Jackson could read and write and reading Jackson his rights, Detective Roach attempted to ensure that Jackson understood them, and he reiterated to Jackson that Jackson could stop talking at any time. Jackson signed a waiver of rights form. Officer Roach made no threats to get Jackson to waive his rights. After signing the waiver form, Jackson immediately and willingly began to talk to Detective Roach about K.B.'s allegations and to deny those allegations.

**{¶36}** We note that while Jackson signed the waiver of rights form, no express waiver, either oral or written, was explicitly required. *State v. Williams*, 2d Dist. Montgomery No. 28648, 2021-Ohio-1340, ¶ 55. "An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver." *State v. Winfrey*, 1st Dist. Hamilton No. C-070490, 2008-Ohio-3160, ¶ 24, quoting *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); *State v. Lather*, 110 Ohio St.3d 270, 2006-Ohio-4477, 853 N.E.2d 279, ¶ 11. Rather, a waiver may be inferred "from the suspect's behavior, viewed in light of all the surrounding circumstances." *Lather* at ¶ 11, quoting *State v. Murphy*, 91 Ohio St.3d 516, 518, 747 N.E.2d 765 (2001). One such circumstance in which a waiver can be inferred is where a defendant proceeds to speak after having been advised of her or his rights and indicating an understanding of them. *Williams* at ¶ 55.

**{¶37}** Here, not only did Jackson sign the waiver form, but he proceeded to speak to Detective Roach immediately after discussing the rights and signing the waiver. Because Jackson's decision not to invoke his rights was uncoerced and because he was aware that he could stop talking and request a lawyer at any time, and that anything he said could be used against him in court, the waiver of his rights was valid as a matter of law. *See Durgan*, 1st Dist. Hamilton No. C-170148, 2018-Ohio-2310, at ¶ 23.

**{¶38}** In considering the totality of the circumstances regarding whether the confession was voluntary, the trial court found that Officer Rivera told Jackson he could help himself by admitting his wrongdoing, implored Jackson to step up and be a man, and appealed to Jackson's humanity by noting that people make mistakes. It further found that Officer Rivera did not make misrepresentations, promise leniency, or engage in coercion.

**{¶39}** These findings were supported by the record. Officer Rivera engaged in very intense questioning of Jackson and refused to accept Jackson's denial of misconduct. The questioning involved repeated encouragement of Jackson to tell the truth and offers to help him. It also involved Officer Rivera repeatedly (in excess of ten times) informing Jackson that he had failed the polygraph examination and stating that he knew Jackson had committed the actions he was being accused of. While the questioning was confrontational, Officer Rivera did not coerce, threaten, or mistreat Jackson.

**{¶40}** "Admonitions to tell the truth are uncoercive in nature" and are permissible. *State v. Carovillano*, 1st Dist. Hamilton Nos. C-060658 and C-060659, 2007-Ohio-5459, ¶ 25. Nor did Officer Rivera's offer to help Jackson result in coercion. We have held that "promises that the defendant[']s 'cooperation' would be considered in the disposition of his case, or that it would be in the defendant's 'best interest' to tell the 'real story,' did not negate the voluntary nature of a confession."

14

*State v. Cedeno*, 192 Ohio App.3d 738, 2011-Ohio-674, 950 N.E.2d 582, ¶ 20 (1st Dist.). Further, "suggestions of leniency, promises that a defendant's cooperation will be considered in the disposition of charges, and statements that a confession will be helpful do not invalidate an otherwise legal confession." *Carovillano* at ¶ 25.

**{¶41}** In this case, Officer Rivera's statements during the interview were intense and confrontational, but were not coercive and did not render Jackson's confession involuntary. *See Cedeno* at ¶ 20. Officer Rivera's repeated admonitions to him that he failed the polygraph examination, without also telling him that the results of the examination were not admissible at trial, likewise did not render his confession involuntary. Police are not required to tell a suspect that polygraph results are inadmissible at trial. *See State v. Lytle*, 4th Dist. Ross No. 96CA2182, 1997 Ohio App. LEXIS 921, *11 (Mar. 10, 1997).

**{¶42}** Jackson additionally argues that his confession was coerced because of Officer Rivera's use of the "Reid Technique" of interrogation. While Officer Rivera was briefly asked about the Reid School of Interviewing during his trial testimony, Jackson did not raise this argument in his motion to suppress before the trial court and no evidence was presented on it at the suppression hearing. We do not address this argument on appeal, as we may "only consider evidence presented at the suppression hearing." *Durgan*, 1st Dist. Hamilton No. C-170148, 2018-Ohio-2310, at ¶ 26 (the court declined to consider an argument about the "Reid Method" where the defendant had not raised the issue at the hearing on the motion to suppress).

**{¶43}** Following our review of the record, we hold that Jackson made a knowing, voluntary, and intelligent waiver of his rights, and that his confession was not the result of coercion. The trial court did not err in denying Jackson's motion to suppress, and the first and second assignments of error are overruled.

*Amendment of Indictment*

**{¶44}** For ease of our discussion, we consider Jackson's fourth assignment of error out of order. In this assignment of error, Jackson contends that the trial court violated his constitutional right to due process when it granted the state's motion to amend the indictment.

**{¶45}** As discussed above, the indictment alleged that the offenses were committed between April 1, 2015, and October 1, 2015. The state had selected these dates in part based on K.B.'s statement that the offenses occurred when she was going into the third grade. Under the state's calculation, K.B. had started the third grade in August of 2015. Trial testimony from both K.B. and Lena Burnett, however, indicated that K.B. actually started the third grade in August of 2016.

**{¶46}** The state moved to amend the indictment to include the time period of April 1 to October 1 in both the calendar years 2015 and 2016. The trial court granted the motion over Jackson's objection. It found that Jackson was not prejudiced by the amendment because the amendment did not change the essential elements of the offenses and because Jackson was aware of the state's allegation or theory that these crimes occurred during the period of time that he lived with Coleman.

**{¶47}** Because Jackson objected to the amendment of the indictment at the trial level, we review the trial court's decision to permit the amendment for an abuse of discretion. *State v. Svoboda*, 2021-Ohio-4197, 180 N.E.3d 1277, ¶ 132 (1st Dist.).

**{¶48}** The purpose of an indictment is to give notice to the accused. *Id.* at ¶ 134. It should "apprise the defendant of that which he may expect to meet and be required to answer." *Id.*, quoting *State v. Horner*, 126 Ohio St.3d 466, 2010-Ohio-3830, 935 N.E.2d 26, ¶ 10. Pursuant to Crim.R. 7(D), "[t]he court may at any time before, during, or after a trial amend the indictment, information, complaint, or bill of particulars, in respect to any defect, imperfection, or omission in form or substance,

16

or of any variance with the evidence, *provided no change is made in the name or identity of the crime charged.*" (Emphasis added.)

**{¶49}** The amendment of the indictment in this case did not change the names of the offenses. Prior to the amendment, Jackson was charged with four counts of rape. He was charged with the same offenses following the indictment. Nor did the amendment of the indictment change the identity of the offense. *See Svoboda* at ¶ 136 (the amendment of the indictment from the time period January 1, 2008, to December 31, 2008, to the time period August 1, 2011, to May 31, 2012, "did not change the identity of the charge or the nature of the conduct alleged"). The nature of the conduct that Jackson was alleged to have committed did not change, nor did the location where the offenses were alleged to have taken place. The victim of the offenses remained the same, as the did the surrounding circumstances.

**{¶50}** The state consistently proceeded under the theory that Jackson committed these offenses during the period of time that he lived with Coleman because he had access to K.B. to commit the offenses during that time period, as she often stayed at Coleman's before and after school. The bill of particulars stated that:

> On or between April 1, 2015 and October 1, 2015, when Defendant was living at Defendant's grandmother Linda Coleman's residence in the vicinity of 1702 Berkley Avenue, Cincinnati, Ohio, Defendant engaged in sexual conduct with K.B. on three separate occasions. On the first occasion, Defendant stuck Defendant's finger in K.B.'s vagina and put Defendant's penis in K.B.'s mouth. The other two occasions, Defendant inserted Defendant's penis into K.B.'s vagina. K.B. was in third grade and 7-8 years of age at the time (date of birth is August 6, 2007).

**{¶51}** All parties in this case were focused on the time period that Jackson lived with Coleman and not the specific chronological year in which the offenses occurred. While Jackson testified at trial that he lived with Coleman in the year 2015,

he was not as certain of that timing when he spoke with Detective Roach in January of 2020. During that interview, he could not identify the specific year that he lived with Coleman, but stated that he thought it was either 2015 or 2016. At all times throughout this case, the reference point for Jackson for preparing alibi evidence and defending against the offenses with which he was charged was the period of time that he lived with Coleman. He had the opportunity to produce alibi evidence for this time period, if such evidence existed. And the record contains no evidence that it did. Accordingly, we are not persuaded by Jackson's argument that the amendment impeded his ability to produce alibi evidence. And, even if he was only focused on 2015 prior to trial, the record is devoid of any evidence that he had an alibi for 2016. Further, he did not seek a continuance to address this.

{¶52} The fact that the amendment occurred during the middle of the trial is troubling, as it did not leave Jackson time to "adjust his defense strategy accordingly." *See Svoboda*, 2021-Ohio-4197, 180 N.E.3d 1277, at ¶ 136 (where amendment was made over a year prior to trial, defendant had time to adjust defense strategy). Nonetheless, because the reference point for Jackson as to when the offenses were alleged to have occurred—the time period that he lived with Coleman—did not change, his defense strategy presumably would not have been altered, and he still had the ability long before trial to produce alibi evidence for that time period. And, Jackson does not argue that he did, in fact, have an alibi for 2016, nor did he seek a continuance to obtain evidence of any alibi that might exist.

{¶53} Because the amendment did not change the name or identity of the offenses, we hold that the trial court did not abuse its discretion in granting the state's motion to amend the indictment. The fourth assignment of error is overruled.

### *Ineffective Assistance*

**{¶54}** In his third assignment of error, Jackson argues that the cumulative effect of defense counsel's errors violated his right to the effective assistance of counsel.

**{¶55}** Trial counsel will not be considered ineffective unless counsel's performance was deficient and caused actual prejudice to the defendant. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373 (1989). Trial counsel's performance will only be deemed deficient if it fell below an objective standard of reasonableness. *Strickland* at 688; *Bradley* at 142. A defendant is only prejudiced by trial counsel's performance if there is a reasonable probability that the outcome of the proceedings would have been different but for the deficient performance. *Strickland* at 694; *Bradley* at 142.

**{¶56}** Jackson first argues that counsel was ineffective for failing to seek a continuance after the indictment was amended to change the dates of the offenses. He argues that he was entitled to a continuance under Crim.R. 7(D), and that counsel's failure to request a continuance prohibited him from securing alibi evidence for the new dates in the indictment. Crim.R. 7(D) provides that if an amendment is made to the indictment to cure a variance between the indictment and the proof, the defendant is entitled "to a reasonable continuance, unless it clearly appears from the whole proceedings that the defendant has not been misled or prejudiced by the defect or variance in respect to which the amendment is made, or that the defendant's rights will be fully protected by proceeding with the trial, or by a postponement thereof to a later day with the same or another jury."

**{¶57}** We concluded in response to Jackson's fourth assignment of error that the amendment to the indictment did not change the identity of the offenses and that

the trial court did not abuse its discretion in granting the amendment. We also explained that the amendment did not change Jackson's reference point for when these offenses were committed—at all times, Jackson's reference point for preparing alibi evidence was the period of time that he lived with Coleman. While Jackson asserts that he could have obtained alibi evidence for the new dates in the indictment if counsel had requested a continuance, the record contains no evidence of an alibi. Where the allegations of ineffectiveness are based on facts outside the record, we are unable to determine on appeal whether ineffective assistance of counsel occurred. *State v. Giuggio*, 1st Dist. Hamilton No. C-170133, 2018-Ohio-2376, ¶ 10.

**{¶58}** Jackson also contends that counsel was ineffective for arguing that his confession was not voluntary because of his reduced mental capacity and then failing to investigate the argument further and introduce evidence, such as school records, in support of that claim. Again, Jackson's allegations of ineffectiveness are based on matters outside the record, and we cannot determine in this appeal whether counsel was ineffective on this ground. *See id.*

**{¶59}** Jackson's remaining contentions in support of his ineffective-assistance argument concern the testimony of Tracy Colliers, the social worker who interviewed K.B. at the Mayerson Center. He argues that counsel was ineffective for failing to object to the admission of Colliers's videotaped interview with K.B. Prior to Colliers's testimony, defense counsel made an oral motion in limine to exclude the video of Colliers's interview with K.B. The trial court overruled the motion after finding that the interview was admissible under Evid.R. 803(4). Jackson argues that counsel was ineffective for failing to object to the admission of the interview because K.B.'s statements in the interview were not made for the purposes of medical diagnosis or treatment, were testimonial in nature, and were admitted in violation of the Confrontation Clause.

{¶60} The Confrontation Clause is found in the Sixth Amendment to the United States Constitution. It provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." In *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court held that the Confrontation Clause prohibits the admission of "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *See State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 81.

{¶61} *Crawford* only applies when the statements involved are testimonial. *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, ¶ 59; *State v. Williams*, 2017-Ohio-8898, 101 N.E.3d 547, ¶ 10 (1st Dist.). So in order to determine whether K.B.'s statements violated the Confrontation Clause, we must first determine whether they were testimonial. This court has held that "[s]tatements made to medical personnel for the purpose of diagnosis or treatment are not testimonial under *Crawford* 'because they are not even remotely related to the evils that the Confrontation Clause was designed to avoid.' " *Williams* at ¶ 11, citing *Muttart* at ¶ 63.

{¶62} In determining whether a statement was made for the purposes of medical diagnosis or treatment by a child to a medical or social worker professional in child-abuse cases, relevant factors to be considered include "(1) the nature of the questioning—whether the interviewer asked leading or suggestive questions; (2) whether the child had a reason to lie; (3) whether the child understood the need to tell the truth; (4) the age of the child at the time the statements were made; and (5) whether the child's statements were consistent." *Id.* at ¶ 11.

{¶63} Here, K.B. was in the sixth grade at the time of her interview with Colliers. She was not questioned in an overly leading or suggestive manner, she had

21

no motive to lie, she seemed to understand the need to be truthful, and she was consistent in her allegations that Jackson engaged in sexual acts with her. In reviewing the factors set forth above, we find that the trial court did not err in determining that K.B.'s statements were given for purposes of medical diagnosis or treatment. As such, they were not testimonial and their admission did not violate the Confrontation Clause. But even if the statements had been testimonial, we still would find no violation of Jackson's right to confrontation because K.B. testified at trial. *See id.* at ¶ 13. As this court has explained in multiple instances, there is no confrontation-clause violation where the child victim testifies at trial. *Id.; State v. Lukacs*, 188 Ohio App.3d 597, 2010-Ohio-2364, 936 N.E.2d 506, ¶ 15 (1st Dist.).

**{¶64}** Having found no confrontation-clause violation, we turn to Jackson's argument that Colliers's interview of K.B. contained inadmissible hearsay and that the interview was not admissible under Evid.R. 803(4). Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement." Evid.R. 801. Generally, statements containing hearsay are inadmissible. Evid.R. 802. But under Evid.R. 803(4), statements made for the purposes of medical diagnosis and treatment are not excluded by the hearsay rule. As we have determined that K.B.'s statements to Colliers were made for the purpose of medical diagnosis or treatment, the statements, while hearsay, were thus admissible under Evid.R. 803(4). Defense counsel, consequently, was not ineffective for failing to object to Colliers's videotaped interview of K.B.

**{¶65}** Jackson also argues that defense counsel was ineffective for failing to object to the trial court's decision to allow Colliers to testify as an expert witness. He contends that it was error to admit expert-opinion testimony when the expert's opinion was not set forth in a written report in compliance with Crim.R. 16(K).

Jackson's argument concerns Colliers's testimony, set forth below, about latent disclosures and the absence of physical trauma to a victim.

**{¶66}** Colliers was asked by the prosecutor if she was familiar with the term "latent disclosure." She responded affirmatively, stating that "disclosing is a process for many kids. So many kids do not often disclose right away, and it could be for a number of different reasons." Upon an objection from Jackson, the state had Colliers set forth her training and qualifications on the topic of latent disclosures. The trial court overruled Jackson's objection, stating that "She's not actually having an opinion as to this witness. This is just general purposes for the record. She has an educational background to testify to it. I'm going to let her testify to it." Colliers then testified that she regularly sees latent disclosures at the Mayerson Center.

**{¶67}** Colliers also testified that a physical examination of K.B. showed no signs of trauma, and she stated that the absence of physical trauma did not necessarily rule out abuse having occurred. Jackson again objected to this part of her testimony. And the trial court again overruled the objection, stating that Colliers was not offering a specific opinion about K.B. and was talking in generalities.

**{¶68}** Assuming that Colliers's testimony was opinion testimony that should have been disclosed in a report and that defense counsel was deficient for failing to object on this ground, we cannot find that defense counsel rendered ineffective assistance because Jackson has shown no prejudice. The record contains K.B.'s testimony that Jackson raped her, as well as Jackson's admission to touching K.B. and engaging in oral sex with her. We cannot say that there is a reasonable probability that the outcome of the proceedings would have been different had defense counsel objected and Colliers's opinion testimony been excluded.

**{¶69}** The third assignment of error is overruled.

23

***Sufficiency and Weight***

**{¶70}** In his fifth and sixth assignments of error, Jackson argues that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence.

**{¶71}** In reviewing the sufficiency of the evidence, we must determine whether, "after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 12, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. When reviewing a challenge to the weight of the evidence, we must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

**{¶72}** Jackson was convicted of four counts of rape in violation of R.C. 2907.02(A)(1)(b), which provides that "[n]o person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person."

**{¶73}** Jackson does not challenge the age element of this offense, but rather contends that the only evidence that a crime occurred was K.B.'s trial testimony, which he argues was inconsistent with prior statements that she had given about the offenses.

**{¶74}** K.B. testified that the first time Jackson touched her, he called her into Coleman's bedroom, pulled down her pants, and put his finger in her vagina. She further testified that on two occasions, she pretended to be asleep while Jackson put

his penis inside her vagina. And she testified that during one of the incidents of sexual conduct, Jackson told her to open her mouth. And that after she did so, he squirted something into her mouth. Viewing this evidence in the light most favorable to the prosecution, we hold that K.B.'s testimony, if believed, was sufficient to establish that Jackson committed four separate counts of rape. *See Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, at ¶ 12.

**{¶75}** Jackson's argument about the inconsistency of K.B.'s testimony is relevant to a manifest-weight-of-the-evidence analysis, not a sufficiency analysis. He is correct that K.B. at times contradicted herself when testifying at trial. For example, she initially testified that Jackson had not put his penis anywhere else inside her body other than her vagina, but after she read the letter she had written several years earlier describing Jackson's actions, K.B. recalled that he had squirted something into her mouth after instructing her to open her mouth. Any inconsistencies in K.B.'s testimony concerned the details surrounding the specific sexual acts committed against her; they did not involve whether a sexual offense actually occurred or whether Jackson was the perpetrator of the offenses. K.B. remained consistent in her testimony that Jackson was the person who had committed these acts of rape.

**{¶76}** As we review this testimony, we are mindful that K.B. was less than ten years of age when these offenses were committed. She first disclosed the offenses three years after they occurred, and she testified at trial almost two years after that. It is not inconceivable that such a young child would not recall the specific details of these offenses with 100 percent accuracy. Further, the trial court was aware of the discrepancies in K.B.'s testimony, and it was able to take them into consideration when determining what weight to accord the testimony and when assessing K.B.'s credibility. In fact, the trial court plainly found K.B. to be a credible witness. In a written decision finding Jackson guilty, the trial court stated that "K.B.'s testimony

was consistent with her earlier statements; her testimony was credible, and the surrounding evidence presented by the State supported her testimony."

{¶77} In addition to K.B.'s testimony, the record contained Jackson's confession to Officer Rivera. Although the acts admitted to by Jackson differed from the sexual conduct described by K.B., the trial court could plausibly have viewed Jackson's confession as an admission to some wrongdoing while attempting to minimize the seriousness of his actions. Further, the trial court was entitled to reject Jackson's recantation of his confession at trial as self-serving.

{¶78} In support of his manifest-weight argument, Jackson further relies on Coleman's testimony that Jackson never stayed the night at her apartment when K.B. and her siblings were there and that she never left K.B. alone in the apartment. Again, we point out that the trial court was in the best position to judge the credibility of the witnesses. *See State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus; *State v. Shepard*, 1st Dist. Hamilton No. C-190747, 2021-Ohio-964, ¶ 62. It was aware of the familial relationship between Coleman, Jackson, and K.B., and it was entitled to believe some, all, or none of Coleman's testimony.

{¶79} This was not the rare case in which the trier of fact lost its way and committed a manifest miscarriage of justice in convicting Jackson. *See Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. Jackson's convictions were supported by both the sufficiency and the weight of the evidence. The fifth and sixth assignments of error are, accordingly, overruled.

### *Conclusion*

{¶80} Having overruled all six assignments of error raised by Jackson, we affirm the trial court's judgment.

Judgment affirmed.

**WINKLER** and **BOCK, JJ.**, concur**.**

Please note:

The court has recorded its own entry on the date of the release of this opinion.