[Cite as *State v. Scott*, 2021-Ohio-3427.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


STATE OF OHIO,                             :          APPEAL NOS. C-200385
                                                                           C-200403
    Plaintiff-Appellee,                  :          TRIAL NOS.  B-1805183
                                                                           B-1904164
vs.                                        :

CURTIS SCOTT,                              :
                                                        *O P I N I O N.*
    Defendant-Appellant.                 :



Criminal Appeals From:  Hamilton County Court of Common Pleas

Judgments Appealed From Are:  Affirmed in C-200385; Appeal Dismissed in
                       C-200403

Date of Judgment Entry on Appeal:  September 29, 2021



*Joseph T. Deters,* Hamilton County Prosecuting Attorney, and *Mary Stier*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Angela Glaser*, for Defendant-Appellant.

**CROUSE, Judge.**

{¶1} Defendant-appellant Curtis Scott was indicted for kidnapping with firearm specifications, abduction, felonious assault in violation of R.C. 2903.11(A)(2) with firearm specifications, having a weapon while under a disability, and felonious assault in violation of 2903.11(A)(1) in the case numbered B-1904164. After trial, he was acquitted of the R.C. 2903.11(A)(2) felonious-assault charge, having a weapon while under a disability, and the firearm specifications to the kidnapping count. He was convicted of kidnapping, abduction, and the R.C. 2903.11(A)(1) felonious-assault charge. In an unrelated case, numbered B-1805183, Scott pled guilty to having a weapon while under a disability.

{¶2} He has appealed, arguing in five assignments of error that (1) the trial court erred in admitting an out-of-court statement of a witness taken by a 911 operator; (2) the trial court erred in failing to instruct the jury on the lesser-included offense of assault; (3) the felonious-assault conviction was supported by insufficient evidence; (4) the kidnapping conviction was against the manifest weight of the evidence; and (5) the trial court erred when it sentenced him for kidnapping rather than abduction.

{¶3} The appeal numbered C-200403 relates to Scott's guilty plea and conviction in the case numbered B-1805183 for having a weapon while under a disability. He has not presented any assignments of error or argument regarding that case. Therefore, we dismiss the appeal numbered C-200403. In the appeal numbered C-200385, we overrule all assignments of error and affirm the judgment of the trial court.

### Factual Background

{¶4}   Brenda Luper testified that at approximately 4:00 a.m. on July 11, 2019, she and Scott, her boyfriend at the time, got into an argument in her apartment. She left the apartment, but Scott chased after her. He caught up with her in the hallway of the apartment building.

{¶5}   The state played surveillance video from the hallway that captured what happened next. The video is approximately eight minutes long.  Luper fell to the ground while running away from Scott. He grabbed her by her hair and punched her in the face. He began dragging her by her hair back toward the apartment as she struggled to get free. He punched her in the face again.  She got free and ran away, but Scott ran her down at the end of the hallway. For approximately two minutes, Luper laid on the ground while Scott alternated between talking to her and talking to a neighbor standing off camera.

{¶6}   Then, while Luper was sitting against the wall, Scott kicked her in the head four times. Luper rolled to the middle of the hallway and Scott began hitting her with his fists.  He grabbed her by her hair and dragged her back toward the apartment, punching her in the face and stomping on her head multiple times along the way. He picked her up and "body slammed" her onto the ground. Scott punched her several more times and then grabbed her by her hair and forced her back in the apartment.

{¶7}   Luper testified that once they reentered the apartment, Scott let go of her and turned to lock the door. She ran to the bathroom and closed the door. Scott attempted to push the door open, but she braced her feet against the door and her back against the toilet, which prevented him from opening the door.  She testified

that Scott threatened her repeatedly. He told her that he would bash her teeth out with a liquor bottle, shave her "Mohawk," pistol whip her, and shoot her in the face. Throughout the ordeal, he would come back to the bathroom every ten to 15 minutes and threaten her. She testified that several hours after she barricaded herself in the bathroom, he shot through the door and the bullet narrowly missed her, passing approximately an inch above her shoulder.

{¶8} There were no windows in the bathroom and Luper did not have her cell phone or watch on her. She testified that she heard the apartment door open and close several times, but she did not know whether Scott had left the apartment. She opened the bathroom door at one point and did not see Scott in the apartment, but she did not leave the bathroom because she was afraid he might be hiding.

{¶9} Luper formulated an escape plan. She testified that she took down her shower curtain rod and "secured" it against the door in order to keep the door from moving. She ripped out the inside of her medicine cabinet with the intention of climbing through to the other side of the wall. She was cautious about alerting Scott, so it took her a long time to break through the medicine cabinet. She decided she could not climb through the wall, but she heard people talking in her neighbor's bathroom. She eventually got her neighbor's attention by using part of her toilet paper dispenser to tap on her neighbor's medicine cabinet, which was on the other side of the hole she had created. She told her neighbor that she had been locked in the bathroom and that Scott had a gun and was trying to kill her.

{¶10} The neighbor left and came back a few minutes later with a man, to whom Luper repeated her story. The man called the police. The state introduced a recording of the 911 call. On the call, you can hear the female neighbor, her male

4

friend ("Kobe Bryant"), and the dispatcher. Bryant and the neighbor told the dispatcher that Luper was tapping on their mirror and telling them that Scott has a gun and that she's trapped in the bathroom.

{¶11} Police officers arrived on scene at 7:43 p.m., approximately 15 hours after Luper had locked herself in the bathroom. Luper was taken to a hotel that night, but was allowed to return to the apartment the next day. She showered in the apartment and conducted an interview with a news reporter she had called. Luper testified that she received multiple calls from Scott on July 12 and 13 asking her to retrieve certain possessions for him, including his firearm, and bring them to a mutual friend. Luper testified that on July 13, after Scott told her where the firearm was hidden, she informed Detective Benjamin Miller. Miller testified that police recovered the firearm and a bullet from the wall in the bathroom. They determined that the bullet had been fired by that firearm. But they could not determine to whom the firearm belonged because the crime scene had been left unsecured.

{¶12} After being arrested, Scott was interviewed by detectives and an audio recording of the interview was played at trial. He admitted to assaulting Luper but denied firing a gun at her or kidnapping her.

### First Assignment of Error

{¶13} In his first assignment of error, Scott contends that the trial court erred in admitting the recording of the 911 call because the recording was hearsay.

{¶14} Defense counsel objected to the call's admission at trial, so we review for an abuse of discretion. *HSBC Bank USA, Natl. Assn. v. Gill*, 2019-Ohio-2814, 139 N.E.3d 1277, ¶ 10 (1st Dist.).

{¶15}  Evid.R. 802 prohibits the admission of hearsay. Evid.R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

{¶16}  Evid.R. 803(1) provides an exception to the hearsay rule for present sense impressions. A present sense impression is "A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate lack of trustworthiness." *Id.*

> Generally, statements that fit within the present sense impression exception are viewed as trustworthy because: (1) there is no loss of memory; (2) there is little or no time for calculated misstatement; and (3) they are usually made to one who has equal opportunity to observe and check misstatements.

2 *Wharton's Criminal Evidence*, Section 6:19 (15th Ed.2020) (discussing Fed.R.Evid. 803(1)).

{¶17}  Although a 911 dispatcher is unable to verify the declarant's statements, Ohio courts have routinely held that 911 calls are admissible as present sense impressions.  "911 calls are usually admissible under the excited utterance or the present sense impression exception to the hearsay rule." *State v. Smith*, 2017-Ohio-8558, 99 N.E.3d 1230, ¶ 37 (1st Dist.), citing *State v. Crowley*, 2d Dist. Clark No. 2009 CA 65, 2009-Ohio-6689, *5 ("the key to the statement's trustworthiness is the spontaneity of the statement, either contemporaneous with the event or immediately thereafter. By making the statement at the time of the event or shortly thereafter, the minimal lapse of time between the event and statement reflects an

insufficient period to reflect on the event perceived—a fact which obviously detracts from the statement's trustworthiness."); *see State v. Steward*, 2020-Ohio-4553, 159 N.E.3d 356, ¶ 48 (10th Dist.), quoting *State v. Rose*, 8th Dist. Cuyahoga No. 89457, 2008-Ohio-1263, ¶ 42 ("Precedent overwhelmingly supports the conclusion that 911 calls are admissible either as excited utterances or present sense impressions.").

**{¶18}** During the 911 call, Bryant told the dispatcher, "I can hear my neighbor in my restroom she's saying please call 911, help, I swear to God on my kids, so I just called, I think she's being held captive, I don't know, she said, she's tapping and stuff on the door * * * I can hear her, she's in there tapping on our wall." The neighbor spoke into the phone and said "she saying he got a gun, bust the door down, he's holding her hostage." Because the neighbor and Bryant were relaying Luper's statements and their perceptions of the event as it was unfolding, their statements qualify as present sense impressions.[1]

**{¶19}** Scott contends that the statements were nonetheless inadmissible because the emergency nature of the situation had passed, and therefore, the statements were testimonial in nature. The neighbor and Bryant did not explain a past event. Rather, they described a present, emergency situation. Thus, their statements were nontestimonial. *See Smith,* 2017-Ohio-8558, 99 N.E.3d 1230, at ¶ 37 ("Because 911 calls seeking police assistance are not testimonial in nature, the Confrontation Clause does not apply."); *State v. McGee*, 1st Dist. Hamilton No. C-150496, 2016-Ohio-7510, ¶ 17; *Davis v. Washington*, 547 U.S. 813, 827-828, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) (holding that statements made during a 911 call

---

[1] Although not raised by Scott on appeal, Luper's statements arguably constitute hearsay within hearsay. *See* Evid.R. 805. But her statements are admissible as excited utterances. *See* Evid.R. 803(2). Therefore, there is no violation of Evid.R. 805.

7

were nontestimonial because the declarant was describing an ongoing emergency and the purpose of the 911 operator's questions was to resolve the present emergency).

{¶20} Accordingly, Scott's first assignment of error is overruled.

### Second Assignment of Error

{¶21} In his second assignment of error, Scott contends that the trial court erred in failing to instruct the jury on the lesser-included offense of assault for the R.C. 2903.11(A)(1) felonious-assault count. But the record shows that the instruction *was* given by the trial court. The second assignment of error is overruled.

### Third Assignment of Error

{¶22} In his third assignment of error, Scott contends that his felonious-assault conviction was not supported by sufficient evidence.

{¶23} The test for determining the sufficiency of the evidence is whether "after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt." *State v. MacDonald*, 1st Dist. Hamilton No. C-180310, 2019-Ohio-3595, ¶ 12, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). It is a question of law for the court to determine, the court is not to weigh the evidence. *MacDonald* at ¶ 12. "When evidence is susceptible to more than one construction, a reviewing court must give it the interpretation that is consistent with the judgment." *In re J.C.,* 1st Dist. Hamilton No. C-180493, 2019-Ohio-4027, ¶ 20.

{¶24} Scott was convicted of felonious assault in violation of R.C. 2903.11(A)(1), which prohibits knowingly causing serious physical harm to another.

Scott argues that although Luper suffered some physical harm, the state failed to prove that she suffered *serious* physical harm.

"Serious physical harm to persons" means any of the following:

(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

(b) Any physical harm that carries a substantial risk of death;

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

R.C. 2901.01(A)(5).

{¶25} The degree of harm required to establish serious physical harm "is not an exact science, particularly when the definition includes terms such as 'substantial,' 'temporary,' 'acute,' and 'prolonged.' " *State v. Crossty*, 2017-Ohio-8382, 99 N.E.3d 1048, ¶ 21 (1st Dist.), quoting *State v. Irwin*, 7th Dist. Mahoning No. 06 MA 20, 2007-Ohio-4996, ¶ 37. "The extent or degree of a victim's injuries is 'normally a matter of the weight, rather than the sufficiency of the evidence.' " *Id.*

{¶26} Serious physical harm has been found where a victim sustained a bloody cut and significant swelling to the face, even when there was no evidence that stitches were required. *Crossty* at ¶ 22. Extensive bruising can constitute serious physical harm because a bruise may satisfy the statutory requirement for temporary

serious disfigurement. *Id.* at ¶ 23. In *Crossty,* the court found sufficient evidence of serious physical harm where there was extensive bruising and swelling on the victim's head, arms, hands, and back, deep abrasions on her hand, a gash on her scalp, and large swelling and a gash under her deeply blackened eye that required medical tape to close the wound. *Id.* at ¶ 24.

{¶27} In *State v. Daniels*, 14 Ohio App.3d 41, 41-42, 469 N.E.2d 1338 (1st Dist.1984), this court held that there was sufficient evidence of serious physical harm where the victim suffered a broken nose and injuries to her back, hands, and leg, was treated at a hospital for her injuries, experienced pain and was unable to sleep for several nights because of pain resulting from the contact of her swollen head and face to the bedding, suffered recurring headaches from the time of the attack to the date of trial, a period of three and a half months, and continued to use Tylenol as pain medication. In *State v. Sheppard*, 1st Dist. Hamilton No. C-000553, 2001 WL 1219765, *2 (Oct. 12, 2001), this court held that there was sufficient evidence of serious physical harm where the evidence showed welts on the victim's face and head, blood spots in her eyes, cuts on the inside of her mouth, knots on her head, and a laceration on her right index finger, and, as a result of her injuries, the victim missed four days of work.

{¶28} "Where injuries to the victim are serious enough to cause him or her to seek medical treatment, the finder of fact may reasonably infer that the force exerted on the victim caused serious physical harm as defined by R.C. 2901.01(A)(5)." *State v. Carter*, 3d Dist. Seneca No. 13-18-13, 2018-Ohio-4468, ¶ 28, quoting *State v. Montgomery,* 8th Dist. Cuyahoga No. 102043, 2015-Ohio-2158, ¶ 12; *see State v. Boscarino*, 2d Dist. Montgomery No. 25580, 2014-Ohio-1858, ¶ 15.

{¶29} "[C]ourts have repeatedly stated that 'where the assault causes a bone fracture, the element of serious physical harm is met.'" *Carter* at ¶ 29, quoting *Montgomery* at ¶ 13; *see State v. Eichelbrenner*, 1st Dist. Hamilton No. C-110431, 2013-Ohio-1194, ¶ 33 (holding that there was sufficient evidence of serious physical harm where the victim suffered a broken collarbone).

{¶30} Loss of consciousness, concussions, headaches, and head trauma may also provide sufficient evidence of serious physical harm. *See State v. Battles*, 8th Dist. Cuyahoga No. 109265, 2021-Ohio-310, ¶ 17.

{¶31} Luper described her injuries at trial. She testified that as a result of the assault she had a cut under her eye, the right side of her face was swollen, she had scratches on her neck and bruises and abrasions on her knees and hip, her ring finger on her left hand "was really big and swollen, and it was throbbing and [she] couldn't bend it." She testified that the pain in her head and side worsened to the point where she went to the hospital on July 17, 2019. She testified, "It was hard to sleep. Headaches coming and going. It was more frustrating than anything." She was diagnosed with a fractured finger and was given a finger cast to wear. At the time of trial, she was still sometimes experiencing pain in her finger.

{¶32} The state admitted photographs of Luper's injuries and her hospital records. The records described Luper's finger injury upon admission as a "displaced fracture of distal phalanx of left ring finger, initial encounter for closed fracture." The records described the status of her finger injury during her July 31, 2019, follow-up visit as "left ring finger bony mallet," but also stated that x-rays of her left hand showed "displaced, intra-articular distal phalanx avulsion fracture."

{¶33} Taken in the light most favorable to the state, Luper experienced swelling and bruising to her face and head, headaches, a fractured finger, and bruising/abrasions to her hip and knees. The pain worsened over the six days between the assault and her admission to the hospital, and the pain kept her awake at night. The state presented sufficient evidence that Luper's injuries resulted in "physical harm that involve[d] acute pain of such duration as to result in substantial suffering or that involve[d] any degree of prolonged or intractable pain."

{¶34} The third assignment of error is overruled.

### *Fourth Assignment of Error*

{¶35} In his fourth assignment of error, Scott contends that his kidnapping conviction was against the manifest weight of the evidence.

{¶36} In reviewing a claim that a conviction is against the manifest weight of the evidence, we review the record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact, in resolving conflicts in the evidence, "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned." *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717. Reversal of a conviction and a grant of a new trial should only be done in the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶37} "The trier of fact is in the best position to judge the credibility of the witnesses and the weight to be given to the evidence presented." *State v. Carson*, 1st Dist. Hamilton No. C-180336, 2019-Ohio-4550, ¶ 16.

{¶38} As relevant here, R.C. 2905.01(A) provides,

No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

* * *

(3) To terrorize, or to inflict serious physical harm on the victim or another.

{¶39} Scott argues that Luper voluntarily returned to her apartment from the hallway and then restrained herself in the bathroom. His argument is clearly contradicted by the surveillance video, which showed Luper being chased down the hallway and beaten and dragged by her hair back to the apartment. Once they were inside, Scott locked the apartment door. Unable to escape, Luper sought safety in the bathroom. She testified that she remained in the bathroom because Scott continued to threaten her and she was afraid that if she opened the door he would kill her.

{¶40} Scott's use of force and threats restrained Luper in the bathroom. *See State v. Blanton*, 2018-Ohio-1278, 110 N.E.3d 1, ¶ 60 (4th Dist.) (holding that the defendant had restrained a fellow prison inmate by telling him that if he sought medical attention he would be assaulted again).

{¶41} Scott argues that he left the apartment multiple times and Luper could have exited from the bathroom but chose not to. Luper testified that although she could hear the apartment door open and close several times she did not know for certain that Scott had left the apartment, and she was afraid he may have been trying to trick her into coming out of the bathroom.

{¶42} Nothing presented by Scott leads us to believe that the jury clearly lost its way and created a manifest miscarriage of justice. The fourth assignment of error is overruled.

### Fifth Assignment of Error

{¶43} At the sentencing hearing, the court merged the kidnapping and abduction counts and, without any input from the state, sentenced Scott for kidnapping. "The General Assembly has made clear that it is the state that chooses which of the allied offenses to pursue at sentencing, and it may choose any of the allied offenses." *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, ¶ 20.

{¶44} Scott argues that the court erred in unilaterally sentencing him for kidnapping because the state made no election at the sentencing hearing. The Tenth District rejected this argument in *State v. Cruz-Altunar*, 10th Dist. Franklin No. 18AP-951, 2019-Ohio-2298, ¶ 21. "The absence of an election by [the state] as to which of the two murder charges [the state] wished to pursue for sentencing does not implicate any constitutional right belonging to appellant." *Id.* at ¶ 27. Therefore, the trial court did not err to Scott's prejudice when it chose the allied offense for which to sentence him.

{¶45} The fifth assignment of error is overruled.

### Conclusion

{¶46} The case numbered C-200403 is dismissed. In the case numbered C-200385, we overrule all five assignments of error and affirm the judgment of the trial court.

Judgment accordingly.

14

**MYERS, P.J.,** and **BOCK, J.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.