[Cite as *State v. Hammonds*, 2024-Ohio-1259.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-220315 |
| Plaintiff-Appellee, | | TRIAL NO. B-2001383B |
| | : | |
| vs. | | |
| | : | |
| MARK HAMMONDS, | | |
| | : | |
| Defendant-Appellant. | : | |

| | | | |
|---|---|---|---|
| STATE OF OHIO, | : | APPEAL NOS. | C-220344 |
| | | | C-230262 |
| Plaintiff-Appellee, | | TRIAL NOS. | B-2001383A |
| | : | | B-2006391 |
| vs. | | | |
| | : | | |
| DARRELL HAMMONDS, | | *O P I N I O N.* | |
| Defendant-Appellant. | : | | |

Criminal Appeals From: Hamilton County Court of Common Pleas

Judgments Appealed From Are: Reversed and Cause Remanded

Date of Judgment Entry on Appeal: April 3, 2024

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Keith Sauter,* Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Arenstein & Gallagher* and *Elizabeth Conkin,* for Defendant-Appellant Mark Hammonds,

*Angela J. Glaser,* for Defendant-Appellant Darrell Hammonds.

**Bock, Presiding Judge.**

{**¶1**}    We sua sponte consolidate two separate appeals of codefendants-appellants Mark Hammonds and Darrell Hammonds,[1] who were tried jointly and raise identical dispositive arguments in their first assignments of error. Both defendants argue that the trial court erred when it denied them access to otherwise confidential Hamilton County Department of Job and Family Services ("HCJFS") records. We agree and hold that these defendants must have reasonable access to HCJFS records that are relevant and material to their defense. We sustain Mark's and Darrell's first assignments of error, reverse their convictions, and remand the case for a new trial.

{**¶2**}    Mark also challenges the sufficiency of the evidence supporting his rape convictions. But we hold that victim statements in medical records and forensic interviews describing penetrative acts establish sexual conduct as an element of rape and suffice to sustain a conviction for rape in violation of R.C. 2907.02(A)(1)(b).

{**¶3**}    Because we sustain their first assignments of error, Darrell's remaining assignments of error and Mark's remaining nine assignments of error are moot.

## I. Facts and Procedure

{**¶4**}    In a 17-count indictment, the state charged codefendants Mark, Darrell, and Andre Miller with rape in violation of R.C. 2907.02(A)(1)(a) and (b), and gross sexual imposition in violation of R.C. 2907.05(A)(4) and (B). The child victims named in the indictment are Darrell's children, and Mark's nephews and niece.

{**¶5**}    In counts one through three, the state alleged that Mark committed one count of rape and two counts of gross sexual imposition against his niece K.H. in 2010. In counts ten and 11, the state alleged that Mark raped his nephew D.D. twice between

---

[1] Because the Hammonds share a surname, we refer to them by their first names. Moreover, we refer to some witnesses by their first name only to protect the children's identities.

September 2016 and September 2018. While the state initially alleged that Mark raped his nephew J.D. in February 2020 in count 15, that count was dismissed before trial. The state also alleged, in counts 16 and 17, that Mark committed gross sexual imposition against J.D. twice in 2018.

{¶6} In counts six through nine, the state alleged that Darrell raped his son D.D. on four occassions—twice between February 2015 and March 2019 and twice between March 2019 and February 2020. In counts 12 through 14, Darrell allegedly raped his son J.D. once in 2018, and committed gross sexual imposition against J.D. twice that same year. And in a separate indictment, the state alleged that from May 2014 to May 2019, Darrell raped his daughter N.D. on five occasions.

### *Pretrial Motions*

{¶7} The parties litigated several pretrial issues. All three defendants moved for separate trials from their codefendants and to sever the counts contained in the indictment. The trial court granted Miller's motion for a separate trial, but it denied Mark's and Darrell's motions.

{¶8} Mark requested HCJFS records involving Darrell's children dating back to 2009. Darrell requested access to HCJFS records involving his children dating back to 2015. The trial court reviewed the records and denied their motions because it "didn't see anything [they] would be entitled to."

{¶9} For its part, the state asked the trial court to allow D.D. and J.D. to testify remotely under R.C. 2945.481. The trial court granted the state's motion during the trial. In addition, it granted the state's request to introduce evidence of Darrell's "other bad acts" to show a common scheme or plan of medicating his children.

*The trial*

{¶10} Over the course of the nine-day trial, the state presented as witnesses the four child victims (K.H., N.D., D.D., and J.D.); Desiree, the mother of N.D., D.D., and J.D.; Tameka, Darrell and Mark's cousin; a pediatric physician employed by Cincinnati Children's Hospital; and two social workers and forensic interviewers employed by the Mayerson Center for Safe and Healthy Children at Cincinnati Children's Hospital ("Mayerson"), who interviewed the four children after the allegations came to light. The state introduced 30 exhibits at trial, including the children's medical records, Mayerson interview tapes and transcripts, reports prepared by the social workers, K.H.'s cell phone data, and diagrams and aids used during D.D.'s testimony. Mark and Darrell did not present any witnesses.

{¶11} The evidence established that Darrell has seven children with two women. As a working single father, Darrell asked his brother Mark to move into his home to help with childcare. Darrell was often gone, and Mark "did not work and pretty much watched [Darrell's] kids."

A. The aunt and mother of the child victims testified against Darrell and Mark

{¶12} Desiree testified that she met Darrell when he was married to K.H.'s mother because she babysat K.H. K.H.'s mother lived with Darrell until 2016.

{¶13} Desiree gave Darrell custody of N.D. and D.D. when she was experiencing legal troubles, mental-health issues, and housing insecurity. And she "got in trouble again" when J.D. was roughly ten months old, so she placed him with her ex-girlfriend, J.D.'s "custodian." J.D. lived with Desiree's ex-girlfriend until 2019 when Desiree sought custody of her son. But "the caseworker wouldn't let me have him" due to an allegation reported to HCJFS, so J.D. lived with his siblings at Darrell's house for approximately two months in 2017-2018. Desiree testified that Darrell

4

received "a check" for D.D., and she started receiving that check after she was given emergency custody of N.D. and D.D. in 2019.

{¶14}   She explained that she "got emergency custody of the children because Mr. Hammonds wouldn't come pick up the children or bring me their medicine." Desiree questioned the propriety of her children's prescriptions and would often not administer their medication when her children were in her care. N.D. and D.D. were both prescribed multiple medications. Desiree sometimes did not give D.D. his morning medications because it would "slip [her] mind." But she also felt the dosage was too high and had D.D.'s prescription dosage lowered. In 2020, a doctor prescribed D.D. two medications for "mental health issues." According to Desiree, HCJFS removed her three children from her custody in 2022 due to an insurance lapse, which caused D.D. to "run out of his medicine," and because of an "episode at school."

{¶15}   Desiree described the night when her children first informed her of the abuse and when she reported it to the authorities. She was driving her children to White Castle sometime around midnight on a Sunday night in February when N.D. "disclosed everything to me and was crying." Sometime around noon the following day, she called 241-KIDS and 911 to report the abuse. Initially, she testified that she did not record a video of the disclosures, but she later acknowledged telling the 911 dispatcher and investigating officers that she had a video of her children's disclosures. She testified that she had no further discussions with the children about the abuse following their initial disclosure.

{¶16} Bodycam footage depicts the responding officers' interviews with Desiree, N.D., D.D., and J.D. outside of an apartment. In the footage, Desiree tells officers that she recorded the disclosure and that N.D. explained that Darrell raped each of his daughters. When officers later requested the recording, Desiree said it was

missing because her ex-girlfriend and J.D.'s custodian "stole my phone and took the SD card out." At trial, she testified that the video was three minutes long, but she had told police it was 27 minutes. Desiree believed the recording was emailed to the HCJFS caseworker, but the caseworker and agency never received it.

{¶17} The children's aunt, Tameka, testified and described an incident following HCJFS's removal of Darrell's children from his house in February 2020. HCJFS placed K.H., N.D., and two of Darrell's other daughters in her care. Tameka recalled learning about K.H.'s 2010 abuse after then 15-year-old K.H. visited the police station. Tameka described confronting Darrell at his work about what happened to K.H., and that he gave her "three options. He says, one, kill myself. Two, kill my brother, or three, run."

{¶18} Tameka testified that she was in the room with K.H. when Darrell called his daughter to ask why she disclosed the abuse to her boyfriend instead of her father. In that conversation, he told K.H., "If your siblings get taken away, this will be all your fault." Tameka described receiving repeated threats and was forced to surrender her foster children to HCJFS out of concerns for their safety.

{¶19} Tameka testified that she was close with Darrell, and that he had expressed concern about Mark, who was protective of K.H. and monitored her phone. Over objections, the state played a jail call between Tameka and Darrell's current wife Tiana, who was incarcerated at the time of the call. Throughout the call, Darrell's wife speculated about the possibility of Darrell "touching" his kids and his administration of the children's melatonin prescription.

## B. The child victims described their abuse

### 1. N.D.

{¶20} N.D., who was 14 years old at the time of the trial, lived with her father, Darrell, until 2019-2020. She recalled being told by her mother that any visitation "depend[ed] on if she slept with my dad." N.D. explained that she was prescribed "night medicine," or melatonin and clonidine.

{¶21} N.D. testified that when she was five years old, Darrell called her onto his bed and touched the outside of her "private areas" as she laid on his bed. This happened "more than once." When she was six years old, his "wang doodle" touched her vagina. This also occurred "more than once." When she was seven years old, Darrell inserted his "wang doodle" into her vagina. This occurred three times, all on his bed. Though she could not recall many details, he told her "you're my favorite" and would stop "when I would scream." This stopped when N.D. was eight years old because Darrell "would then abuse my step mom."

{¶22} N.D. testified that the last incident occurred when she was 12 years old. In the living room, N.D. sat on Darrell's lap and "felt his genital parts rise up." Feeling uncomfortable, she "hopped off of him and left the room." That night, he "insisted for me to go to sleep in his room." She recalled being "halfway asleep when I felt my hand being used to touch his genital parts." She left the room, washed her hands, and "stayed in the room with my sisters until it was time for me to go home."

{¶23} N.D. explained that she did not disclose the sexual abuse because her father physically abused her and her siblings, and she believed he would "kill me or one of my siblings, I don't know, or hurt us." According to N.D., she disclosed "everything that happened" to her mother one summer night in her mother's car, during a drive with her brothers D.D. and J.D. She testified that her mother recorded

the disclosures "so that way she would be able to have evidence to show the police." Following her disclosure, her "brothers started to speak up." While N.D. testified that she did not witness her siblings' abuse, she recalled hearing D.D. screaming in her father's bedroom. She also described seeing blood in D.D.'s underwear.

{¶24} Following the disclosures, physicians at Children's Hospital examined N.D. N.D. spoke with social workers at Children's Hospital twice, though she withheld some details because she "didn't feel comfortable." After the disclosures, N.D. and D.D. were placed in their mother's care temporarily until "[D.D.] made up lies because he wanted to go back to his foster parent."

### 2. D.D.

{¶25} D.D. was 12 years old at the time of the trial and initially testified in person. He recalled being eight years old when something "unusual" happened with his father, Darrell. D.D. spoke in general terms but recalled lying face down on a bed as something happened with his "behind." Later, he testified that his father and another person touched him in a private spot.

{¶26} When asked about the details of these incidents, D.D. answered, "I don't know" and later, "I don't want to say" because "my depression is kicking in fast." Over objections, the trial court allowed D.D. to write his answers to the state's questions. D.D. testified that he told his sister about his experiences at his father's house. When asked what he told his sister, D.D. used a diagram to indicate that he was touched on his "buttocks." When asked who touched him there, D.D. wrote "dad mrak [sic]." When asked which part of his father touched his "buttocks," D.D. circled a penis on the diagram.

{¶27} Over objections, D.D. continued his testimony remotely. He recalled that Darrell's hand and "pee-pee" touched his "bottom," or "anus." Something came

8

out of his father's "pee-pee," but D.D. refused to go into detail. He could not recall whether his father touched him "inside or outside" of his "bottom," and was unsure of how many times it happened. When asked if another person touched his private area, D.D. answered "nobody." But later, he confirmed that something similar happened with his uncle Mark.

{¶28} D.D. testified that he spoke with his mother and older sister N.D. about the case. He explained that he first heard the word "rape" from his mother and sister sometime in 2019, and he explained that rape means "to get sexually assaulted by someone you trust or someone you don't know." He recalled speaking with social workers at Cincinnati Children's Hospital "1,700 times."

### 3.  J.D.

{¶29} Over objections, 11-year-old J.D. testified remotely from Cincinnati Children's Hospital, where he sat with a victim's advocate and a hospital employee. He recalled visiting Darrell's house to spend time with his siblings but stayed for weeks because his mother "forgot to pick me up because she had work that day." According to J.D., Darrell and Mark touched his "front" where "pee comes out," or his "you know" when he was seven years old. He testified that when he was sleeping on the top of his bunkbed with his brother D.D. asleep on the bottom bunk, Darrell touched J.D.'s "front" under J.D.'s clothes with his hand. He also said Mark touched J.D.'s "front" with his hand "one time," though it occurred in Mark's room.

{¶30} J.D. testified that he first called his mother Desiree from Darrell's house and told her about the incidents, and that Mark "put his gun to my head." He also explained that he first disclosed the abuse when he "ran away [with his brother], and then we went to Children's. And then one day my mom came to visit me and I told her what happened." He later testified that he disclosed the abuse to his mother in the car

9

with his siblings N.D. and D.D., and explained that his mother recorded his and his siblings' disclosures. His mother recorded it "for proof"—"to prove Darrell has been touching me and my siblings."

**{¶31}** During cross-examination, defense counsel questioned J.D. about his initial interview with police and showed him a video of his interview to refresh his recollection. In the video, he told officers that Mark had cut him with a knife from his cheek to his ear just two days earlier. At trial, he acknowledged that there was no mark on his face in the video. In the footage, he told officers that Darrell did something to his behind. At trial, D.D. acknowledged telling the HCJFS case worker that Darrell was not his dad and that he was unaware of any sexual contact as he slept, that he was knocked out, and that he did not feel a thing.

### 4. *K.H.*

**{¶32}** K.H. was 17 years old at the time of the trial. She is Darrell's daughter and the half-sister of N.D., D.D., and J.D. She testified that after her mother and her stepmother left the picture, Darrell was "all we had." She explained that Mark moved into their house to "help[] with, you know, washing, cleaning, cooking," and transportation.

**{¶33}** K.H. characterized the accusations against Darrell as "a 'get back' game." She believed that "all this stuff was planned and plotted" by both her Aunt Tameka and her stepmother Desiree. Specifically, she testified that Tameka coached her to lie to police and prosecutors. She explained that "the whole plan was for Uncle Mark to leave because he was too strict and stuff. I don't – he wouldn't let me do what I want." She testified that Tameka was motivated by a desire to receive kinship benefits and ultimately "get a big house with all my siblings."

{¶34}   K.H. believed that her half-siblings were fabricating the allegations. She explained that her stepmother Desiree is less strict than her father and uncle. She testified that the allegations against Darrel and Mark were "all made up." K.H. testified that J.D.'s time in Darrell's house was limited to one time in the summer of 2019 and later on Christmas.

{¶35}   K.H. recalled when Desiree first learned that Darrell was receiving social security checks for D.D. According to K.H., Desiree wanted her children's social security benefits, and that is "when the accusations first got started." She testified that her father did not trust her stepmother with money, because she would "spend it on herself and on drugs and other things, other than her kids." K.H. recalled seeing D.D. after Desiree assumed responsibility for his benefits, stating that his pants were too short, "[s]hoes too small. Hair not cut. Ashy. Bottom of his feet dirty, no socks," and he appeared to be starving.

{¶36}   K.H. denied having been inappropriately touched by her Uncle Mark in 2010 and could not recall going to Cincinnati Children's Hospital in 2010. She explained that her Uncle Mark moved into her house in 2013 and would not have been alone with her in 2010. And if something occurred, she would have told her father. K.H. was declared a hostile witness, and the state attacked her credibility with three pieces of evidence.

{¶37}   First, the state questioned K.H. about a "Reporting Form to Alleged Sexual Abuse," which documented her 2010 visit to Cincinnati Children's Hospital. The form indicates that she was brought to the hospital by her stepmother, Desiree. According to the form, K.H. told a social worker, "Uncle Mark touches me here (pointing to crotch). He touches me under my pants and his fingers (pointing to vaginal area)." The form said that K.H. reported that Mark had touched her "butt"

while wearing gloves. K.H.'s 2010 physical examination was "unremarkable" and revealed "NO physical findings suggestive of sexual abuse."

{¶38} Next, the state impeached her with a two-paragraph note from K.H.'s cell phone addressed to herself and drafted in January 2020 after N.D., D.D., and J.D. made allegations against her father and uncle. The note was drafted when K.H. was placed in kinship care with Tameka. That note states, in relevant part, that "ive [sic] always wanted a mfc [sic] to get me and understand me and learn what i been through as a little girl but nobody will never understand being touched on bye there [sic] uncle as a little girl." K.H. explained that she originally drafted the other portions of the note for her then boyfriend, but Tameka added the part referring to "being touched" by an uncle.

{¶39} Over objections, the state played an unredacted police interview of K.H. and gave copies of the interview transcript to the jury. In the interview, K.H. initially denied being touched inappropriately by her Uncle Mark. When Officers asked her about the note, she again denied any sexual contact with Uncle Mark. The interviewing officer rejected K.H.'s denial because of her belief that the note "is still true." The officer continued to press K.H. about sexual contact and roughly 40 minutes into the interview, the officer asked K.H. if Uncle Mark's actions were appropriate. K.H. responded, "[N]o, it happened, its [sic] in the past." She remembered sexual contact during the interview, but could not recall any details. At trial, K.H. testified that the officers "kept peer, like pressuring me, like, and they just kept telling me, like – just kept – I don't know how to say it, like. Kept saying stuff and they wanted me to say it."

C. Hospital employees described their interactions with the children

{¶40} Dr. Tendler, a physician employed by Children's Hospital, examined N.D. at the hospital. She explained that N.D. was tested for sexually-transmitted infections because Darrell "is known to have multiple sexually transmitted infections." N.D. tested negative for HIV, syphilis, and hepatitis B and C core antibodies, and hepatitis B surface antigens. While N.D. tested positive for hepatitis B surface antibodies, Dr. Tendler testified that this "indicates that a patient has antibodies to Hepatitis B, which is often from childhood immunization."

{¶41} Emily Harman and Cecilia Freihofer are social workers and forensic interviewers employed by Mayerson. At trial, Harman discussed forensic interviews and described her February 2020 interviews with N.D. and K.H. Harmon described forensic interviews as a "non-leading, non-suggestive" interview of a person who has experienced trauma, a technique that allows the person to "use their own words to tell us what happened." The state introduced into evidence Harmon's "Report of Suspected Child Abuse" for K.H., which indicates that K.H. told Harmon that Desiree manipulated her children to accuse K.H.'s father and uncle to gain custody of her children. It also indicates that she denied ever witnessing or experiencing sexual abuse. The state also entered into the evidence a "Report of Suspected Child Abuse" involving N.D. drafted by Harmon, and both the footage and a transcript of Harmon's interview with N.D.

{¶42} Cecilia Freihofer testified about her interviews with J.D., D.D., and N.D. The state entered into evidence several of Freihofer's "Reports of Suspected Child Abuse" related to D.D.'s July 2019 and February 2020 interviews, N.D.'s second interview in October 2020, and J.D.'s interview. The record also includes two "letter[s]

13

that I wrote that would address things that I would be testifying to today" regarding her interviews with the children.

{¶43} The trial court designated Freihofer as an expert. She described why children or individuals with a history of trauma delay disclosures of traumatic events. She explained that having a familial member as a perpetrator, threats to harm the children and their mother, and general distress were relevant to the children's delayed disclosures and the possibility of learned helplessness.

D. The state played the children's interviews with Freihofer for the jury

{¶44} During N.D.'s interview with Freihofer, N.D. reported having vaginal intercourse with her father in his room when she was seven, nine, and 11 years old. She reported passing out during the sexual abuse and knew it was over because she "woke up." She ran out of the room, cried, and then went to the bathroom. The other instances were "the same thing as the first time." More recently, her father was "butt naked." She reported knowing the latest instance of sexual abuse would happen but was nevertheless shocked. Afterwards, she ran to the shower and rinsed something "white" off of her "private area." After some leading questions, N.D. confirmed that her father threatened to shoot her siblings if she told anyone.

{¶45} The state played D.D.'s interviews with Freihofer. In his July 2019 interview, D.D. told Freihofer that he "got raped" by "Dre." He told Freihofer that he disclosed this to his father, who "wouldn't listen." D.D. explained, "I told my dad that he put a sleeping needle. And then I told my dad * * * and then he didn't believe me." D.D. explained to Freihofer that his father thought he was lying, and that he "tried so hard to stick to that story."

{¶46}  In his February 2020 interview, D.D. told Freihofer that "my uncle and my dad raped me and my sisters." He knew they raped his sisters because "[m]y sister told me." D.D. reported being raped multiple times by his father and uncle starting when he was six years old. When he was ten years old, his father called him into his bedroom,  removed his pants, and "penetrated me" in his "behind" with his "neenaw" or "private spot." He initially told Freihofer that nothing came out of Darrell's "neenaw," but then recalled "something white" came out of Darrell's "neenaw" and went "in my mouth" "because he put it in there." Later, he told Freihofer that it went onto the ceiling. This happened other times. D.D. told Freihofer that his father threatened him with a knife and katana sword. He also recalled Darrell touching his "neenaw" with his finger.

{¶47}  When asked if something happened with his uncle, D.D. confirmed "[t]he same thing." It began when he was seven and ended when he was nine years old. It involved "all of his private parts" and D.D.'s "behind," and happened on his bedroom floor. When asked if his uncle said anything to him during the abuse, D.D. explained that his uncle threatened to "slice [his sister]'s arm off" if he told anyone. D.D. told Freihofer that, during the final incident, he ran out of his uncle's room to his friend's house. D.D. initially told Freihofer that there were no witnesses, but recalled his sisters walking in on the abuse and threatening to call 911, leading to his uncle threatening them—"Don't call 911 or you['re] next." Later, he said that never happened.

{¶48}  D.D. also told Freihofer about a time when he was showering and his uncle showed him nude photos of him and his uncle's girlfriend on a cell phone. And he reported that his uncle showed him videos of children without clothes, doing "[t]he same things." D.D. also told her that he saw posters of naked men on his father's toilet paper and on the wall of his father's bathroom. Finally, he reported to Freihofer that

15

he saw "red stuff" in his underwear and bed.

{¶49} In J.D.'s interview with Freihofer, J.D. initially reported that in 2018, Darrell's private part touched his private parts "once"—"he put it in my butt." Then when Freihofer asked if J.D. "said it happened twice," J.D. explained that it happened on "[t]wo different nights," and what he had described was the second instance of sexual abuse. J.D. told Freihofer that the first instance of sexual abuse occurred when Darrell "play[ed] with my private part," using "his hands, smacking it." J.D. told Freihofer that he "woke up" and punched Darrell. Later in the interview, Freihofer asked J.D. if Darrell "twice put his private part in your butt?" J.D. initially confirmed that it occurred twice, but later explained that there was anal intercourse during the first night, and on the second night, Darrell was "playing with it." J.D. explained to Freihofer that the abuse occurred in his brother D.D.'s room, while his brother slept in his sister's room. Afterwards, J.D. "woke up no pants and off."

{¶50} J.D. also told Freihofer that Mark "was playing with my – my private parts too. He was touching it." The sexual abuse with Mark consisted of touching J.D.'s private part with "[j]ust his hand."

### E. Investigating detective testified

{¶51} Detective Moore investigated the allegations of child rape and sexual abuse by Darrell and Mark. The state played Detective Moore's interview with Darrell's current wife, Tiara, who was incarcerated at the time. Detective Moore explained that she had the initial HCJFS caseworker, who had questioned N.D., D.D., and J.D. the day after they disclosed the abuse to their mother, removed from the children's case. Detective Moore felt the caseworker was "highly inappropriate" for questioning the children about inconsistencies in their disclosures.

*The jury found Darrell and Mark guilty of rape and gross sexual imposition*

{¶52} The jury found Darrell guilty of ten counts of rape and two counts of gross sexual imposition. The trial court merged counts 13 and 14 into count 12, and sentenced Darrell to four ten-years-to-life sentences, and eight life sentences, all set to run concurrently. In addition, Darrell was classified as a tier III sex offender.

{¶53} The jury found Mark guilty of three counts of rape and four counts of gross sexual imposition. The trial court merged counts two and three into count one, and counts 16 and 17 into count 11, sentenced Mark to three concurrent life sentences, and classified him as a tier III sex offender.

## II. Law and Analysis

*Mark and Darrell are entitled to HCJFS records material to their defense*

{¶54} On appeal, Mark raises 11 assignments of error and Darrell raises seven assignments of error, with several overlapping arguments. In their first assignments of error, both defendants challenge the trial court's ruling denying them access to the HCJFS records. They argue that the trial court abused its discretion when, following an in-camera review, it "didn't see anything [Mark and Darrell] would be entitled to."

{¶55} R.C. 2151.421 and 5153.17, the statutes governing investigations and reports of child abuse or neglect prepared by HCJFS and other child service agencies, deem these records confidential. But this confidentiality " 'is not absolute.' " *State ex rel. Clough v. Franklin Cty. Children Servs.,* 144 Ohio St.3d 83, 2015-Ohio-3425, 40 N.E.3d 1132, ¶ 24, quoting *State ex rel. Renfro v. Cuyahoga Cty. Dept. of Human Servs.,* 54 Ohio St.3d 25, 27, 560 N.E.2d 230 (1990). Consistent with a defendant's due-process rights, child service agency records "must be disclosed if the failure to do so denies a defendant evidence 'that is both favorable to the accused and material to guilt or punishment.' " *State v. Haverland,* 1st Dist. Hamilton No. C-050119, 2005-

Ohio-6997, ¶ 15, *rev'd in part on other grounds,* 109 Ohio St.3d 411, 2006-Ohio-2394, 848 N.E.2d 809, ¶ 16, quoting *Pennsylvania v. Ritchie,* 480 U.S. 39, 57, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987); *see* Crim.R. 16(B)(5).

{**¶56**} Records are material if "there is a reasonable probability that the result of the proceeding would have been different if the evidence had been disclosed to the defense." *Id.,* citing *Ritchie* at 57. A "reasonable probability" is a probability " 'sufficient to undermine confidence in the outcome.' " *Id.,* quoting *Ritchie* at 57. "[C]ircumstantial evidence bearing upon the probative value of other evidence in the case can also be of consequence to the action." *State v. Moore,* 40 Ohio St.3d 63, 65, 531 N.E.2d 691 (1988).

{**¶57**} The HCJFS records were sealed for appellate review. The records are contained in 20 envelopes and consist of activity log reports, safety assessments, family assessments, and disposition letters related to the Hammonds, Desiree, K.H.'s mother, Darrell's current wife Tiana, and Desiree's ex-girlfriend.

{**¶58**} The records indicate that D.D. told caseworkers that his mother, Desiree, instructed him to fabricate sexual and physical assault allegations in order for her to regain custody of her children. They suggest that N.D. told a family friend that her mother coached her to accuse her father. The records show that D.D. and J.D. made unsubstantiated claims of physical abuse to caseworkers about their foster parents and include unsubstantiated claims by N.D. about her father's violence. They reference auditory hallucinations experienced by D.D., and other mental-health diagnoses not discussed at trial. The records indicate that D.D. and J.D. tested negative for sexually-transmitted infections and diseases. The records reference a 2010 Mayerson interview, where K.H. denied the allegations about her Uncle Mark.

{¶59} The records indicate that Desiree told a caseworker, "Something is about to go down" days before her children disclosed the abuse to her and she reported it to authorities. The records contain several statements made to caseworkers by relatives and people close to the family indicating that Desiree and Tameka coached the children to make false accusations. In fact, one family friend informed caseworkers that Tameka tried to coach that friend into accusing Darrell of doing "something to [the friend]."

{¶60} The state maintains that these records are not material because unsubstantiated accusations unrelated to the present charges cannot be material to the allegations in this case, relying on our opinion in *State v. Black,* 85 Ohio App.3d 771, 621 N.E.2d 484 (1st Dist.1993). In *Black,* we addressed the use of extrinsic evidence to impeach a victim of sexual assault and explained that "[p]rior unsubstantiated allegations of sexual abuse may affect the credibility of [the victim's testimony], but they do not tend to prove or disprove any elements of the current charge of contributing to the unruliness of a child by engaging in sexual contact with that child." *Id.* at 778. That is so because "[t]he mere fact that an alleged rape victim made prior false allegations does not automatically mean that she is fabricating the present charge." *State v. Boggs,* 63 Ohio St.3d 418, 422, 588 N.E.2d 813 (1992). Assuming that our extrinsic-evidence discussion in *Black* factors into our analysis of Mark and Darrell's access to the HCJFS records, *Black* is distinguishable because the HCJFS records in this case contain evidence related to the fabrication of the present charges against Darrell and Mark.

{¶61} The state also claims that the records are not material because allegations of possible pressure to make false allegations, K.H.'s prior statements, and the children's credibility were explored by defense counsel at trial. But the statements

19

in the HCJFS records are not simply duplicative of the trial testimony. They contain additional medical information relevant to Mark and Darrell's defense and undermine the credibility of the state's key witnesses.

{¶62}   Recently, the Second District considered whether a mother's history of inconsistent statements and false accusations contained in Montgomery County Children Services records were material to the defense against charges of rape and gross sexual imposition of her children. *See State v. Curtiss*, 2d Dist. Montgomery No. 29006, 2022-Ohio-146, ¶ 12. The court held that those records were material because "Mother was a primary prosecution witness, and her credibility and knowledge of events pertaining to violence witnessed by the children was critical to the case." *Id.* at ¶ 61. Significantly, the HCJFS records in this case implicate the credibility of multiple key state witnesses.

{¶63}   This case turned on the credibility of N.D., D.D., and J.D., and the lack of K.H.'s credibility at trial. In turn, Mark and Darrell's defense hinged on their ability to impeach the state's witnesses. The HCJFS records are replete with statements from the victims and other family members that undermine the credibility of the state's witnesses. The records also bolster K.H.'s credibility and her assertion that the children were manipulated into fabricating these accusations against Mark and Darrell. Moreover, in its closing argument the state emphasized the lack of any motive by Tameka to lie. Furthermore, it stressed Desiree's lack of "ability and control over those children to put them up to this." The HCJFS records are relevant to both Tameka's motives and Desiree's influence over her children.

{¶64}   We hold that the HCJFS records were material to Mark and Darrell's defense. If Mark and Darrell had access to these particular records, there is a reasonable probability that the trial result would have been different. That is not to say

that Mark and Darrell are entitled to an unbridled excursion through the confidential records. Their access is limited to records that are material to their defense. And like the *Curtiss* court, "we express no opinion on the eventual outcome; we simply note that the evidence was material and should have been disclosed." *Curtiss* at ¶ 64. Therefore, the trial court unreasonably denied Mark and Darrell access to the HCJFS records. We sustain Mark's and Darrell's first assignments of error, reverse their convictions, and remand the case for a new trial.

{¶65} In his remaining assignments of error, Darrell claims the trial court committed evidentiary errors and improperly denied his motion to separate his and Mark's trials.[2] Darrell also asserts that he received ineffective assistance of counsel, his convictions are against the manifest weight of the evidence, and the trial court's cumulative errors deprived him of his right to a fair trial. Because we reverse and remand for a new trial, these six assignments of error are moot and we decline to address them.

{¶66} Mark's remaining assignments of error challenge the trial court's evidentiary rulings and denial of his motion to sever, assert that the trial court's cumulative errors violated his due-process rights, argue that he received the ineffective assistance of counsel, and claim that his convictions are against the manifest weight of the evidence. These assignments are moot and we do not address them.

---

[2] Mark and Darrell argue that R.C. 2945.481 required the defense and prosecutor's presence in the room with D.D. and J.D. as they testified remotely. We note that the criminal rules were amended in July 2023 and permit remote testimony in certain circumstances. *See* Crim.R. 40(B). However, we take no position on the effect of that amendment.

*The state presented sufficient evidence to convict Mark of rape*

**{¶67}** Mark also asserts as error that there is insufficient evidence to support his convictions for rape and gross sexual imposition of K.H., D.D., and J.D.

**{¶68}** Before turning to the merits of his sufficiency argument, we note that the trial court merged counts two and three into count one, and counts 16 and 17 into count 11 before sentencing. Therefore, Mark was never sentenced for these counts and without a sentence, there is no conviction. *See State v. Johnson,* 1st Dist. Hamilton Nos. C-190658 and C-190659, 2021-Ohio-1321, ¶ 12.

**{¶69}** When we review the sufficiency of the evidence, we must view "the evidence in a light most favorable to the prosecution [and determine whether] any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* at ¶ 7, quoting *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 12, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. When the evidence is reasonably " 'susceptible to more than one construction, [we] must give it the interpretation that is consistent with the judgment.' " *State v. Scott*, 1st Dist. Hamilton Nos. C-200385 and C-200403, 2021-Ohio-3427, ¶ 23, quoting *In re J.C.,* 1st Dist. Hamilton No. C-180493, 2019-Ohio-4027, ¶ 20.

**{¶70}** Mark was convicted for rape of K.H. and D.D. in violation of R.C. 2907.02(A)(1)(b), which provides that rape consists of "engag[ing] in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." Relevant here, the statutory definition of sexual conduct is "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion,

however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another." R.C. 2907.01(A).

{¶71} Beginning with K.H., Mark acknowledges that the medical records of K.H.'s visit to Cincinnati Children's Hospital contain statements indicating that Mark penetrated then-five-year-old K.H., but he argues that "it is actually unclear who actually made the complaint." The medical records, however, explain that "S.W. met [with] pt. alone to interview her." The social worker noted that "Pt. reports Uncle Mark touches me here (points to crotch) He touches me under my pants [with] his fingers (pointing to vaginal area) Pt. reports he touches me 'inside.' " A rational trier of fact could have relied on those statements in the medical records to find that Mark penetrated K.H. in 2010 and therefore engaged in sexual conduct with a person under the age of 13 years old.

{¶72} Turning to D.D., his testimony does not establish that Mark engaged in any penetrative act. Mark appears to argue that D.D.'s statements to Freihofer in his Mayerson interview are outside the scope of our sufficiency inquiry, but we have consistently upheld the trial court's decision to admit statements made during these forensic interviews as statements made for purposes of a medical diagnosis or treatment under Evid.R. 803(4). *See State v. Wright,* 1st Dist. Hamilton No. C-220578, 2024-Ohio-851, ¶ 67; *see also State v. Jackson,* 1st Dist. Hamilton No. C-210466, 2022-Ohio-2562, ¶ 62; *State v. Ridder*, 1st Dist. Hamilton No. C-150460, 2016-Ohio-5195, ¶ 9; *State v. Woodruff*, 1st Dist. Hamilton Nos. C-140256 and C-140257, 2015-Ohio-2422, ¶ 21. And those statements were contained in a document that is admissible as a record kept in the course of a regularly conducted business activity under Evid.R. 803(6). *See Wright* at ¶ 67, fn. 1.

{¶73}  In his Mayerson interviews, D.D. explained that his father penetrated him, his anus was involved, and then said that Mark did "the same thing." Further, he explained that this happened on multiple occasions. Viewing these statements in a light most favorable to the state, the evidence establishes the elements of rape.

{¶74}  We overrule Mark's tenth assignment of error.

### III. **Conclusion**

{¶75}  We sustain Mark's and Darrell's first assignments of error and hold that the trial court should have ordered the disclosure of evidence in the HCJFS records that was material to Mark and Darrell's defense. We overrule Mark's tenth assignment of error because victim statements in medical records and forensic interviews established the elements of rape in violation of R.C. 2907.02(A)(1)(b). Mark's remaining nine assignments of error and Darrell's remaining six assignments of error are moot and we decline to address them. The judgments of the trial court are reversed and this case is remanded for a new trial and further proceedings consistent with the law and this opinion.

Judgment reversed and cause remanded.

**BERGERON** and **WINKLER, JJ.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.

24